**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Aurora CANALES and Elia Garcia,
Defendants-Appellants.**

No. 83–2517.

United States Court of Appeals,
Fifth Circuit.

Oct. 4, 1984.

Rehearing and Rehearing En Banc
Denied Nov. 16, 1984.

**416**

Tony Canales, Nancy M. Simonson, Corpus Christi, Tex., for Canales.

Jaime Garza, Alice, Tex., for Garcia.

Daniel K. Hedges, U.S. Atty., James R. Gough, Susan L. Yarbrough, Asst. U.S. Attys., Houston, Tex., for plaintiff-appellee.

Before GARZA, GARWOOD, and HIGGINBOTHAM, Circuit Judges.

GARWOOD, Circuit Judge:

The defendants Aurora Canales and Elia Garcia were convicted, following a jury trial in June 1983 in Laredo, Texas, on one count of vote buying and one count of conspiracy to buy or offer to buy votes in violation of 42 U.S.C. § 1973i(c) and 18 U.S.C. § 371. In their appeal from these convictions, defendants primarily contend that the evidence presented at trial was insufficient to support their convictions, and that improper statements by the prosecutor deprived them of a fair trial.[1] We affirm.

## I.

### PROCEEDINGS BELOW

Defendants were charged in a five-count indictment under 42 U.S.C. § 1973i(c) and 18 U.S.C. §§ 2 and 371, each count relating to absentee voting in San Diego, county seat of Duval County, Texas, during April 1982 in the Democratic primary election.[2] They were each convicted on counts one and three. Count one charged a conspiracy between defendants and others, named and unnamed, to pay and offer to pay voters to vote for Gilberto Uresti as Democratic nominee for county judge. Two overt acts were alleged: first, an offer by defendant Elia Garcia of a twenty dollar food voucher to Ester Espinoza to vote for Uresti; second, an offer by defendant Aurora Canales of thirty dollars to Lillian Alaniz to vote for Uresti. Defendants were each convicted on this count. The remaining counts charged substantive offenses. Count two charged defendant Elia Garcia, but not defendant Aurora Canales, with paying and offering to pay Ester Espinoza for voting in the election. The jury acquitted Garcia on this count. Count three, on which both defendants were also convicted, charged them each with paying and offering to pay Lillian Alaniz for voting in the election, and with aiding and abetting each other in doing so. Counts four and five, which related to the same events as count three, charged each defendant with paying and offering to pay Lillian Alaniz's son, Jose Alfredo Alaniz, and her daughter, Nancy Jane Alaniz, for voting in the election. The district court granted the defendants' motions for judgment of acquittal on counts four and five at the close of the prosecution's case. Defendants each received identical sentences: concurrent two-year prison terms on each count, each suspended for three years on unsupervised probation, and a two thousand dollar fine on each count, with provision that as soon as the fine on either count was paid, that on the other count would be remitted.

## II.

### SUFFICIENCY OF THE EVIDENCE

Our discussion of the sufficiency of the evidence will largely be confined to that

---

1. The only point raised by defendant Elia Garcia on appeal relates to the sufficiency of the evidence. However, following oral argument Garcia, with leave of this Court, filed a letter adopting the brief and reply brief of defendant Aurora Canales.

2. Defendants also contend that 42 U.S.C. § 1973i(c) may not constitutionally be applied to their conduct because the evidence shows that in this primary election whatever they did related only to voting for candidates for strictly local offices. While this is a correct characterization of the evidence, the evidence also shows without dispute that this election included a contested primary race for the office of United States senator. Hence we must reject defendants' contention on the authority of *United States v. Garcia,* 719 F.2d 99 (5th Cir.1983), involving the identical primary election and offers or payments for votes for the identical office, county judge of Duval County.

relating to Lillian Alaniz, as it is apparent that defendants' convictions are based on the claimed payment and offer of payment to her.

Some of the facts in this connection are undisputed. Gilberto Uresti was the incumbent county judge of Duval County seeking reelection. Aurora Canales was the wife of the mayor of San Diego, a political ally of Judge Uresti, and sister of the president of the board of trustees of a local independent school district. Elia Garcia was employed by Duval County as social services coordinator for its elderly nutrition program. She was hired by vote of the commissioner's court. On the morning of April 13, 1982 defendants Canales and Garcia, who operated together as a "team" in performing volunteer work for Gilberto Uresti's campaign, drove in this capacity in Canales' car to the low-income housing project in or just outside of San Diego where Alaniz lived, for the purpose of taking Alaniz to vote, absentee, for Uresti in the election. They entered Alaniz's apartment. The subject of Alaniz's voting absentee came up. Alaniz then indicated she wanted money for voting, and it was she who initiated this subject. A discussion followed at the apartment. Defendants then drove Alaniz and two of her adult children, her son, Jose, and her daughter, Nancy, to the Duval County courthouse in San Diego for the purpose of having them vote absentee in the election, and urged them to vote for Uresti, showing them a marked sample ballot. Alaniz and her two children then voted, for Uresti, as they had indicated they would. Defendants then drove the three back to the Alaniz apartment. Thereafter, Lillian Alaniz received, and subsequently cashed on April 16, a thirty dollar check of the "Gilberto Uresti campaign fund" payable to her order and dated April 14, 1983. Nothing on the check itself (or on anything shown to accompany it) indicates what it is for; but the stub *remaining in the checkbook* has the notation "campaign work." The check is signed by, and it and the stub are wholly in the handwriting of, Antonio Gongora, who was the assistant treasurer of the Uresti campaign.

Gongora testified that he did not know who Lillian Alaniz was or whether she did any campaign work; that he did not give the check to either defendant or give or send it to Lillian Alaniz; that neither defendant instructed him to write the check; and that he wrote campaign checks only on the instructions of Judge Uresti's secretary, Olga Hinojosa, or Genoveva Garcia, but did not recall who instructed him, or even being instructed, in this instance. Although he signed some campaign checks in blank, he did not do so in this instance, and when, as here, he wrote the date in, he always wrote the date he actually signed a check.

At some point in April 1982 Lillian Alaniz received at her apartment posters and bumper stickers, eight to ten of each, advertising the Uresti campaign. She testified that she did not hand them out or use them, but threw them out on the instruction of her husband, and never did any work for the Uresti campaign. There is no contrary testimony.

The evidence is in dispute in most other relevant respects.

As to the conversation at the Alaniz apartment, Lillian testified, "I told [*sic*] them if they were giving any money and they told me that they were not ... so I told them I needed thirty dollars.... I had to make a payment.... [They said] that they didn't have the money then.... [Canales] told me she would help me out with thirty dollars." (R. 176–77.) Under questioning by the court she testified that what she asked "them if they were giving any money for" was "to go vote," that Canales replied "they weren't giving any money," that Lillian then "told [*sic*] them if they could help me out with thirty dollars," in reply to which Canales "told me that she'd help me out with thirty dollars." (R. 194.) She was asked by the prosecution whether Canales stated "where she was going to get that money or who she was going to check with," and replied, "She was going to check with Gilberto [Uresti]." (R. 195.)

On cross-examination Lillian answered "Yes" when asked if Canales told her "they did not have any money to pay votes." (R. 229.)

Lillian's son, Jose, testified, "My mother asked them if they were giving any money, and they said that they didn't have any money right now, but they could get the money from Uresti." (R. 247.) He further testified that after they had voted, "Mrs. Canales and Elia Garcia took us to the house and they said that they would bring a check or—you know, they said that they would bring the money later on, or tomorrow." (R. 254.) On cross-examination Jose stated, "They told us that they didn't have the money right now, that they were going to get it if we went to vote," and "Mrs. Canales and Elia [Garcia] said that they could help her [his mother] with thirty dollars, but they had to go with Uresti first." (R. 265.)

Lillian's daughter, Nancy, who had married after the events in issue, testified that defendants "entered the house and they told [sic] me and my mother and my brother if we wanted to go vote absentee.... Then my mother said that—okay, but she needed a payment, if they could help her out, and then they said 'Yes, we can help you out but if you go vote for Florencio and Uresti.'" (R. 317.)[3] When asked if defendants said anything "when you went home" after voting, Nancy replied, "They just said that they would bring the money

either this afternoon or tomorrow." (R. 324.)[4] On questioning by the court, Nancy testified:

"The Court: Mrs. Salinas, your mother asked for thirty dollars?

"The Witness: Yes, because she needed help for her payment, and then they said that they would help her out if we would vote for Uresti and the other one that was running." (R. 326.)[5]

On cross-examination Nancy testified that, in response to her mother's request for thirty dollars, Canales "said that they were not giving no money, but she would talk to Uresti and see what would happen." (R. 329.)

Lillian Alaniz's other daughter, Betty Briones, who was married at the time of the events in issue, also testified for the prosecution. She was present at least a part of the time during the discussion with defendants before her mother, brother, and sister were taken to vote, though she remained at the housing project to take care of her younger siblings. Betty testified, "My mother said that if she had—that she needed so [sic] money, and Mrs. Canales said that she didn't have it at that time, and then my mother said that she needed thirty dollars for a payment, and Mrs. Canales said that she had to talk to Mr. Uresti about that, but she wouldn't promise anything." (R. 340.) When asked by the court if the response to her mother's statement

---

3. "Florencio" referred to Florencio Saenz, who was running for county commissioner and was supported by the Uresti organization.

4. Lillian, however, testified that after they voted there was no further conversation that day about money. (R. 186.) She did not, however, testify whether or not she would have heard it if the defendants had stated to Nancy and Jose, as they testified, that the money would be brought that day or the next. Defendants each denied any discussion of money following the voting.

5. Nancy also testified that her mother brought up the figure of thirty dollars, and stated, "She just stated that she needed thirty dollars for a payment." Nancy construed the defendants' response as being ten dollars each for herself, her brother, and her mother, "because they said, if we all would go, then they would help my

mother," and "because they said that, you know, if we all would go, they would help my mother." However, Nancy testified that no one said anything about dividing the amount or ten dollars for each. (R. 327–28.)

Although the district court granted defendants' motion for judgment of acquittal on counts four and five, charging offering to pay and payment to Nancy and to Jose Alaniz for voting, we construe this to have been based not on any rejection of the presently relevant testimony of Nancy or Jose, but rather on the fact that the evidence showed only one payment (and offer) —namely, thirty dollars to Lillian Alaniz—and it was immaterial that the amount thereof may have been *calculated* at ten dollars per person or that Nancy and Jose for that reason considered the offer or payment as in a sense having been made or paid to them as well as to their mother.

of need for thirty dollars was, "We don't have it, but we'll see if we can get it," Betty replied in the affirmative. (R. 345.) On cross-examination she testified that she understood Canales to have said she would "see if Mr. Uresti would agree with the thirty dollars," and that she did *not* hear Canales tell her mother, "We don't pay or give money for votes." (R. 357.)

The defendants' version of these conversations was rather different. To begin with, they explained that they went to Alaniz's apartment that day because when they had arrived earlier that morning at the home of Elijio Uresti, Judge Uresti's brother and a local school principal whose residence was serving as campaign headquarters for the Uresti and allied campaigns, there was a message for Canales that Lillian Alaniz had called and asked that "Aurora" pick her up to vote absentee.[6] Canales, with corroboration from Garcia, testified that she had been reluctant to go on this errand because of a previous unpleasantness with Lillian arising from the fact that Canales did not invite the Alanizes to the wedding of Canales' daughter.[7] Garcia convinced her to go, however. Canales testified that when she and Garcia arrived at the Alaniz apartment, "We went in and we told her that we had gotten the message that she wanted to go vote absentee." (R. 680.) Garcia testified to like effect. This contrasts with the testimony of Lillian Alaniz and her children, none of whom mention any reference at any time by the defendants to their having received a message or request that any of the Alanizes wanted to go vote.[8]

Consistent with the testimony of the Alanizes, Canales and Garcia testified that Lillian then asked for money. However, unlike the testimony of the Alanizes, Canales and Garcia did not recall any mention of a specific figure. Canales described defendants' response to the request for money not in terms of their not having any then, as Lillian Alaniz and her children stated, but rather as, "Lillian, we don't pay any money," and, "Lillian, I cannot. Sorry, but we don't pay any money." (R. 680.) Garcia's description was, "Aurora told her that we weren't paying any money," and "I said, 'Lillian, we're not giving any money.'" (R. 723.)

Perhaps the clearest contrast between the defendants' and the Alanizes' version of the conversation relates to what transpired after the initial refusal, on whatever grounds, of Lillian's request. According to Canales, "Lillian Alaniz said then, after the second time [her request for money was refused], she said, you know, that she wanted to work and help in the Judge Uresti campaign.... She said that she wanted to work there at the project, you know, around the neighborhood, and I said

**6.** Adriana Hinojosa, sister of Elijio Uresti's wife, Irma, testified she was answering the phone at campaign headquarters the morning of April 13, that she received a call requesting that "Aurora" pick up the caller to go vote, and that on her inquiry the caller identified herself as Lillian Alaniz, whom Adriana did not know. Adriana produced a memorandum she had made of the call at that time. She assumed "Aurora" referred to Canales, as she was the only Aurora whom Adriana knew in the campaign. She gave the message to Irma and to Aurora, when the latter came in later that morning. Lillian Alaniz testified that she did not know Adriana Hinojosa and did not recall speaking to her on the telephone the day she voted. She also testified she did not remember calling anyone to be picked up to vote.

**7.** Lillian Alaniz testified she had never had any type of disagreement with Canales or any conversation whatever with her about her daugh-

ter's wedding. Canales testified that she and her husband never saw the Alanizes on a social basis, were not asked to the Alaniz daughter's wedding, and had no idea why Lillian would expect to be invited to the Canales daughter's wedding. Canales had two years of college education. Lillian Alaniz went through the seventh grade, and received welfare payments from time to time.

**8.** Lillian testified, "They came home and they told me if I wanted to vote absentee." (R. 176.). Similar testimony was given by Jose ("We were at the house, and they came to our house and they told us if we wanted to vote" (R. 246)), Nancy ("They entered the house and they told me and my mother and my brother if we wanted to go vote absentee" (R. 317)), and Betty ("Mrs. Canales and Mrs. Garcia came over to my mother's apartment, and I was present there at that time, and Mrs. Canales told my mother if she wanted to go vote" (R. 340)).

that we'd look into it, but that we couldn't promise her anything." (R. 680.) Garcia gave similar testimony, stating that after Lillian was told a second time, "We're not giving any money ... then she said that she wanted to work, she wanted to work for Gilberto Uresti." (R. 723.)[9] The defendants testified that they then asked Lillian if she still wanted to vote, and on being told that she did, took her, Jose, and Nancy to do so.[10]

The testimony of the Alanizes, however, presents a different picture. Lillian, when asked by the court, "What did you do to get that check, as far as you know?" replied, "Well, I told them that I needed some money. I need thirty dollars for a payment and if they could help me out. But I wasn't working with the campaign." (R. 191.) On cross-examination she testified:

"Q Did you tell Mrs. Aurora Canales that you wanted to help in the campaign?

"A No.

"Q Did you tell Mrs. Aurora Canales that you wanted to help Judge Uresti get elected?

"A Yes. I want to help him.

"Q And did you tell Mrs. Aurora Canales to see if she could send you some stickers and pictures to work in the campaign?

"A No, I wasn't going to work in the campaign. [R. 211–12.]

". . . .

"Q. ... [When] she [Canales] told you that she might help you out, were you thinking that she was going to help you out for working in the campaign?

"A No, sir. [R. 222.]

". . . .

"Q Do you remember Mrs. Canales asking you if you wanted to work in the campaign?

"A No, sir." (R. 229.)

On redirect examination Lillian replied, "Yes, sir" when asked "Were you paid thirty dollars in exchange for your vote." (R. 240.)

Jose Alaniz's description of the conversations contains no reference to anything resembling the possibility of campaign work on his mother's, or anyone else's, part, though neither side specifically asked him about it. He did testify, however, that he voted for Uresti "because they told me to vote for him and they would help us with thirty dollars." (R. 305.) Nancy's description of the conversations likewise reflects no reference to campaign work or the like. She testified she voted for Uresti and Saenz "because they paid us to vote for them." (R. 323.) On cross-examination she was asked, "Is it possible that, at that point [when Canales said they were not giving out money], your mother asked for a job with the campaign," to which she replied, "No." She again answered "No" when asked, "Did your mother ask her [Canales] if she could work for the Uresti campaign." (R. 329.) Further cross-examination included the following:

"Q Okay. Is it possible that the thirty dollars check that she [Lillian] received was to act for work she was supposed to do, to hand these [posters and stickers] out?

"A No.

"Q It's not possible?

"A No." (R. 332.)

Betty likewise made no reference in her testimony to campaign work. As noted, she testified that what defendants were going to "check into" was getting the thirty dollars requested. On cross-examination she said it was not possible the thirty dollar check given her mother was for distributing posters or campaign work. She was

---

**9.** Garcia continued by stating, "Well, I told [sic] her that what would she do, and she said 'Well, there's nobody working the housing project.' Well, she was telling this to Mrs. Canales, then Aurora turned to me and she asked me, you know, what I thought about it, and I said, 'Well, we can't hire her. We have to go and discuss it with some of the committee members.' ... We told her that we would ask and that we

would take it from there. But we weren't promising anything." (R. 726.)

**10.** The Alanizes' testimony does not contain any references to this subsequent inquiry about whether she wanted to vote or still wanted to vote.

then asked again, "You're absolutely sure now that that check wasn't for campaign work," and replied, "Yes, sir." (R. 352.)

There is also at least inferential dispute in the testimony as to how, when, and why Lillian Alaniz got the eight or ten Uresti bumper stickers and posters. Defendants sought to infer that Lillian got this material after she voted, as a result of the offer they claimed she made to them to work in the campaign. Neither defendant testified that Lillian had requested any such material or that they were aware she had it, or had requested it, on either April 13 or 14. However, defendants did testify that when they returned to the Elijio Uresti house on the afternoon of April 13 they reported that Lillian had asked to work in the campaign and, Garcia said she reported, be compensated. Canales testified that she told "the other ladies there" of Lillian's request to work in the campaign. (R. 683.) Garcia said she mentioned it to Elijio Uresti and, when he asked her opinion, advised that it would be a good idea. Defense witness Uresti confirmed this, and said that the same day he accordingly directed his wife to prepare a package of material for Lillian and told his wife someone would pick it up.[11] A package normally included calling cards, pencils, buttons, and a booklet, as well as posters and bumper stickers. Uresti did not direct anyone to take the package, and does not recall it being taken or who took it. Each defendant said she did not take any such items to Lillian and did not know who did. Lillian testified that she got the posters and bumper stickers as a result of a telephone call she made to Teresa Briones at the county courthouse requesting these items. She stated that Teresa personally brought them to her house. She initially testified that this all occurred on a day subsequent to the day she voted, but then said she was not sure whether it was before or after. Jose testified that it was after they voted that his mother called for the posters. Nancy said the posters and stickers were received

from Teresa Briones, but she was not sure whether this was before or after the defendants "went to the house." The Alanizes did not receive any campaign cards or buttons or anything other than the posters and bumper stickers. Betty testified her mother called Teresa Briones to bring her some posters and stickers, and Teresa did so. Her mother had already received these before defendants came to take her to vote. (R. 357.)

Elijio Uresti also testified that on April 13, after Garcia and Canales returned to his house that afternoon, and as a result of Garcia's report about Lillian, he authorized that Lillian be hired as a campaign worker. He was unable to state to whom precisely he conveyed this authorization, but said he thought Gongora was present along with several others. He stated he did not fix the amount Lillian Alaniz was to be paid.

On a final, significant point the testimony was in sharp conflict. Lillian Alaniz testified that the day after she voted Aurora Canales came to her house and handed her the thirty dollar check. She twice testified it was in the morning of the day after she voted, but then said it could have been in the afternoon. She said that Aurora simply handed her the check and "said I could cash it; that it was a good check." (R. 189.) Jose testified that the day following the day they voted he saw Canales hand his mother a check at the door of the Alaniz apartment (R. 254–56, 291), and that this occurred about noon (R. 302). He saw Garcia at that time sitting on the passenger side of the car just outside the apartment. (R. 257, 304.) Betty testified that "the next day [after the day the Alanizes were taken to vote], Mrs. Canales came over with Mrs. Garcia. Mrs. Garcia didn't get down out of her car.... Mrs. Canales came over and she knocked on my mother's door, and my mother went over to the door and Mrs. Canales said that she had a check for thirty dollars, drawn on the account of Gilberto Uresti." (R. 341, 344.) She saw

---

**11.** He confirmed that this action was not the result of the telephone call reported by Adriana Hinojosa that morning, as Adriana had simply reported that Lillian had wanted to vote, and had not said she wanted to work in the campaign.

Garcia in the car. (R. 341, 349.) Canales and Garcia in their testimony each totally denied having ever taken any check to Lillian, or indeed having gone back to her apartment the next day or at any time following taking the Alanizes back from voting on April 13. They professed no knowledge of the check or how it got to Lillian. Other than the testimony of Lillian, Jose, and Betty, there was no evidence of how or when the check got to Lillian Alaniz.

In reviewing the sufficiency of the evidence, we must examine "the evidence presented in this case and the inferences that may be drawn from it in the light most favorable to the government," and ask whether "a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Bell,* 678 F.2d 547, 549 (5th Cir.1982) (en banc), *aff'd on other grounds,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). Although the testimony of Alaniz and her children was not entirely consistent, and five witnesses testified as to Alaniz's poor reputation for truthfulness, "[i]t is exclusively the function of the jury to assess credibility" and "[w]e are particularly loath to reject a jury's verdict when it is so manifestly dependent on credibility assessments." *United States v. Kimble,* 719 F.2d 1253, 1256 (5th Cir.1983), *cert. denied,* ⸺ U.S. ⸺, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984).

■ The testimony, viewed most favorably to the government, established that Canales and Garcia asked Lillian Alaniz if they could take her to vote, that Alaniz indicated she would not go unless she was paid thirty dollars, that Canales and Garcia said they didn't have any money then but Canales promised that if Alaniz and her children voted for Uresti they would obtain or try to obtain the thirty dollars for her; that thereafter Alaniz and her children were willing to be and were taken to vote by Canales and Garcia, who each told them to vote for Uresti, which the Alanizes did; that Canales and Garcia then took them home and promised to bring the requested

thirty dollars the next day, which they personally did. The jury was justified in inferring that the thirty dollars was paid for the voting. It was not required to accept the testimony of Canales and Garcia that the discussion prior to voting was not of payment for voting but of working for the campaign. The Alanizes testified that that was *not* the discussion, and that the payment *was* for voting. Nor do the ambiguous circumstances surrounding and testimony concerning the posters and bumper stickers establish that the thirty dollars was paid for campaign work to be performed. Moreover, the jury could find, on the basis of the Alanizes' repeated testimony as to Canales (with Garcia in the car) having brought the check on the following day, that Canales and Garcia were consciously untruthful in their denial on the stand that any such event ever occurred. Such a fabrication could legitimately give rise to an inference that the delivery of the check was with the purpose of making payment for the voting. *See Holt v. United States,* 272 F.2d 272, 275–76 (9th Cir.1959); 2 Wigmore on Evidence § 278(2) (Chadbourn rev. 1979).

Defendants urge that no offer was made because all the witnesses agreed that neither Canales nor Garcia, prior to the voting, expressed a present ability to pay, citing our recent decision in *United States v. Hernandez,* 731 F.2d 1147, 1149 (5th Cir.1984). While the applicability of *Hernandez* may be doubted, as it was based on the lack of any kind of offer at all and not on the lack of ability to pay, nevertheless it is not controlling as to the sufficiency of the evidence on count three, the substantive count, for a more fundamental reason. The conviction on count three does not depend on a technical offer having been extended, but is sustained by proof of the actual payment made.

Garcia claims that the proof shows no criminal involvement on her part. We reject this contention. Regardless of whether Garcia's guilt as a principal was adequately established, the evidence is plainly sufficient to support her conviction on an

aiding and abetting theory, as charged in count three. She was present when the statements were made to Alaniz about getting her the thirty dollars and participated in that conversation. There was sufficient evidence for the jury to conclude that she was also present when the check was delivered the next day, although she denied that. Although Lillian and her children said there was no request for campaign work, Garcia testified that she told Uresti that Alaniz had requested to work in the campaign. She was Canales' teammate in campaigning, including the events of April 13. The jury could legitimately conclude that Garcia aided and abetted Canales in paying Lillian Alaniz the thirty dollars for voting for Uresti, as charged in count three.

■ We hold that the evidence, taken as a whole, is sufficient to support each defendant's conviction on count three.

■ Defendants argue, however, that count one, the conspiracy count, cannot be sustained because the single pertinent overt act alleged was merely the offer to Alaniz, not the payment to her.[12] They also contend that even if a true "offer" were made to Alaniz, there is no evidence that the offer was pursuant to a conspiracy, arguing in this connection that Alaniz initiated the subject of payment, and that even if Canales' response was an offer, there is nothing to suggest that Canales and Garcia, or Canales and anybody else, had conspired beforehand to make the offer. While we have some doubt as to the ultimate validity of defendants' forceful contentions in this respect,[13] we need not definitively rule on them. It is not necessary for us to separately review the conspiracy conviction because we sustain the

conviction on the substantive count (count three), and the sentences are concurrent. The conspiracy count, as it relates to Lillian Alaniz, and the related substantive count three are different only in the most technical sense. The confinement imposed on each is concurrent, and the defendants have been placed on unsupervised probation. The fines imposed are the same on each count, and as soon as either is paid the other will be remitted. In these circumstances, there is no substantial likelihood that the unreviewed conspiracy conviction will adversely affect either defendant in the discharge of her respective sentence, and we hence apply the concurrent sentence doctrine and decline to review the conspiracy count (count one). *See United States v. Vasquez-Vasquez*, 609 F.2d 234 (5th Cir.1980) (per curiam); 8A Moore's Federal Practice (2d ed.) ¶ 32.04[7].

We accordingly reject each appellant's claim that reversal is required on the grounds of insufficient evidence.

### III.

### CONDUCT OF PROSECUTOR

Appellants assert several instances of alleged prosecutorial misconduct during the course of trial, principally, though not exclusively, in the prosecutor's closing jury argument. We conclude that none of these instances, singly or in combination, warrant reversal.

■ 1. The first complained of incident occurred during the government's cross-examination of Adriana Hinojosa (*see* note 6, *supra*). On initial cross-examination Adriana had testified, without objection, that she taught school in Harlingen and lived there, but voted in Duval County, of which

12. The other overt act alleged was the offer to Espinoza, and the jury acquitted on the related substantive count, count two. *Cf. United States v. Larkin*, 605 F.2d 1360, 1370 (5th Cir.1979), *withdrawn in part on other grounds*, 611 F.2d 585, *cert. denied*, 446 U.S. 939, 100 S.Ct. 2160, 64 L.Ed.2d 793 (1980).

13. In a conspiracy prosecution "[t]he overt act ... need not be itself a crime." *Braverman v. United States*, 317 U.S. 49, 53, 63 S.Ct. 99, 101,

87 L.Ed. 23 (1942). "Nor, indeed, need such an act, taken by itself, even be criminal in character." *Yates v. United States*, 354 U.S. 298, 334, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957). Further, it is by no means clear that the circumstances are insufficient to support an inference that Canales and Garcia in effect jointly made an offer to Lillian Alaniz and did so pursuant to an at least tacit mutual understanding.

she considered herself a permanent resident. Following further cross-examination on other topics, Adriana was asked by the prosecutor how long she had lived in Harlingen, she replied eight years, and was then asked, "Do you own a house in Harlingen." Before Adriana could reply, defense counsel objected "to the relevancy of whether she owns a house or not." The court asked the prosecutor, "What do you say about that" and, receiving no answer, repeated the inquiry, to which the prosecutor then made the presently complained of response: "Well, I say, Your Honor, it looks like we have an illegal voter here that votes in another county; that there could be some motive for her to go ahead and fabricate other things which shows her motive why she wants to make sure that certain candidates win." (R. 645.) Defense counsel then "object[ed] to counsel's statements," stating that under the Texas election code one could legally be a permanent resident for voting in one place and nevertheless "work somewhere else for years." The court, stating "I don't want to get bogged down in some side issue," then asked Adriana, "Do you own a home in Harlingen," to which she replied in the negative, the court then remarking "Okay." The prosecutor and defense counsel thereupon each said they had no further questions. Defense counsel made no request for any instruction to the jury in respect to the matter.

This essentially trivial incident presents no arguable ground for reversal. In the actual trial setting, it is manifest that the "illegal" voter theory was premised on the witness owning a home in Harlingen; when she answered that she did not, and the court said "Okay," and the whole subject was then dropped, it was the prosecution, not the defense, which suffered. The prosecution had tried to make something out of a "side issue," and had fallen flat on its face in the attempt.

■■■ 2. Complaint is also made of the portion of the prosecutor's closing argument stating:

"You saw Jamie Garza [counsel for defendant Garcia] here, when he made his arguments, who was he talking about the whole time, he talked about Judge Uresti. We know who he's interested in. We know who he's interested in protecting. He told us who he was interested in protecting." (R. 861.)

There was no objection whatever to this argument. Moreover, it must be considered in light of the argument to which it responded. *See United States v. Montemayor*, 684 F.2d 1118, 1124 (5th Cir.1982); *United States v. Hiett*, 581 F.2d 1199, 1204 (5th Cir.1978). Garcia's counsel had argued:

"The investigators went down there and they said, 'This is Duval County.' They didn't look to see if there were two sides to Duval County. They didn't look. They didn't look into this man's character, and this man is at trial, because he's been mentioned left and right. His brother came out—and this is admitted into evidence. And, ladies and gentlemen, please, please, open this up, when you're in the jury room, and look at it very carefully, and I would ask you, is there such thing as guilt by association? There's such a thing as innocent by association, but I am tendering to you people— [R. 814.]

" . . . .

"This is in evidence, and I'm going to argue to you all that these ladies were campaigning for this man, and I want you to focus very carefully at this document. I want you to read through it. I submit to you all that the caliber of this man may be—is the caliber of his supporters. The supporters were supporting this man because he's a good man and because he's done a lot for the county, and this pamphlet, which is in evidence now, which was not objected to, look at it very carefully.

"I think, ladies and gentlemen, that you're going to see that Duval County has progressed under his leadership, and I submit to you all that all that these people were doing was peacefully cam-

paigning for their own preference." (R. 815.)

*See also* note 14, *infra.* None of this was in reply to anything raised by the prosecutor in his opening argument. Given the·argument of Garcia's counsel, the lack of objection, and the factors mentioned in section 5 hereof below, no reversible error is presented in this regard.

3. Another area of complaint relates to references to the mother of defense counsel for Garcia.

■■■ (a) This initially came up in the prosecutor's cross-examination of defense witness Gonzalez, who had testified to Canales' reputation as being honest and truthful. Gonzalez testified on direct that he was the superintendent of the Benavides Independent School District. On cross-examination, he identified Zaragoza Gutierrez, Mr. Tony Villegas, Mrs. Tommy Garza, Mrs. Aida Garza, Mr. Agustin Perez, and Mr. Humberto De Los Santos as being all the members of the school district's board of trustees, and Mrs. Aida Garza as also being the mother of counsel for Garcia, all without any objection. Counsel for Canales objected when the witness was then asked if Mrs. Tommy Garza was the aunt of counsel for Garcia. The court overruled the objection, stating the question was proper cross-examination as relating to the witness' motive for testifying. No objection was made by counsel for Garcia. On further cross-examination, the witness testified, without objection, that Zaragoza Gutierrez, school board president, was the brother of defendant Canales.

We find no reversible error in allowing the complained of testimony. It was plainly admitted to show the witness' bias, and in this regard was essentially cumulative to the testimony that defendant Canales' brother was, in effect, the witness' boss. It is generally regarded as proper to inquire on cross-examination "into *any* incentive the witness may have to falsify his testimony." *Cloud v. Thomas,* 627 F.2d 742, 744 (5th Cir.1980), *cert. denied sub nom. Cloud v. Byrd,* 450 U.S. 1041, 101 S.Ct. 1760, 68 L.Ed.2d 239 (1981) (emphasis added). "Among the commoner sorts of circumstances [admissible to show a witness' bias] are all those involving some *intimate family relationship* to one of the *parties* ... or some such relationship to a person, *other than a party,* who is involved on one or the other side of the litigation .... The relation of *employment* ... by one of the parties, is also usually relevant." 3A Wigmore on Evidence § 949 (Chadbourn rev. 1970) (footnotes omitted). We have stated that "the field of external circumstances from which probable bias or interest may be inferred is infinite. The rule encompasses all facts and circumstances which, when tested by human experience, tend to show that a witness may shade his testimony for the purpose of helping to establish one side of the cause only." *Aetna Insurance Company v. Paddock,* 301 F.2d 807, 812 (5th Cir.1962). Certainly that a witness is employed by trial counsel for a party to the case may be shown as relevant to the witness' bias. That the employment relationship is with a close relative of such counsel attenuates but does not eliminate the relevance. Here the relevance may be further attenuated because the attorney was court appointed, though this was not called to the district court's attention in connection with the objection. "The trial court is given great discretion in determining the scope of cross-examination on the subject of bias ...." *United States v. Hodnett,* 537 F.2d 828, 829 (5th Cir.1976) (per curiam). No abuse of that broad discretion is shown here.

■■ (b) The matter of Aida Garza again came up in closing argument. Counsel for Garcia, in his jury argument, had gone into this area. This first occurred, just after the portion of his argument quoted in 2 above, when he said, "Although I'm not on trial, and my mother is not on trial, it's easy, Mr. Jack Lamar Wolfe [the prosecutor] ...." At this point the court interrupted, stating, "Now, that's out of order," and:

"We know who's on trial. Your mother is not on trial, nor is anybody else that

are not the two defendants here. Duval County is not on trial, ladies and gentlemen." (R. 816.)

Nevertheless, counsel continued by stating, "I think that what Mr. Jack Lamar Wolfe is going to try to show is, 'OK, look at all these people from Duval County involved in the conspiracy'." Later in his argument defense counsel again returned to this theme: "It really hurts to come from Duval County and to see your friends, your people—and it's in evidence that I have praise for these people. And, incidentally, since my mother backed Uresti, let him talk about my mother all he wants. I'm proud of her." (R. 826.)

The prosecutor had not mentioned Duval County or Aida Garza in his opening argument.

In closing argument the prosecutor mentioned Aida Garza three times. On the initial occasion he argued:

"And it keeps going on to the Benavides Independent School District. And who do they bring in here? They bring in here Issac Gonzalez, and he's the superintendent over there. What is Issac Gonzalez' motive for coming in here and saying these people wouldn't lie? Let's look at it. Her brother, Aurora Canales' brother, is the president of the school board. Now, if you think that the president of the school board asks the superintendent to come down here and testify for his sister, what do you think he's going to do?

"Besides that, two other members of the school board, Tony Garza and Aida Garza, and you're going to find—and look in those campaign contributions— that Aida Garza was the head of the kind of the Good-Government League and she gave a thousand dollars to the Uresti campaign, and she was over there. See all these people? She was over there. She was at the headquarters. But they're also members of the school board. They've got three members of the school board and they're telling the superintendent; or asking the superintendent, 'You ought to come over here

and testify as to the good character of my sister and our political friend.' You think he's going to come?" (R. 857–58.)

There was no objection to any of this argument. So far as it related to the credibility of the defense witness Gonzalez, it was proper argument for the reasons previously stated. Additionally, defense counsel had already raised the matter of his mother and expressly stated that she, a member of the school board which employed Gonzalez, had "backed Uresti." For the reasons stated below, while the reference to Aida Garza's financial contribution may have been improper, it does not present reversible error.

■ Next, the prosecutor mentioned that "Fito Saenz, Elijio Uresti, Aida Garza, Ruperto Canales, Armando Garza, Olga Hinojosa, all the Urestis, Teresa Briones, they're all involved in this whole thing." (R. 862.) The evidence showed these individuals were involved in backing Uresti or in the Uresti political organization. There was no objection to this argument, and it does not present reversible error.

■ The prosecutor's final reference to Aida Garza occurred in the following context:

"[Prosecutor Wolfe]: When you also look in there, you'll find out that there's another little strange thing in there. You're going to find out that this Good Government League—and I guess it's the one that Aida Garza headed up; I'm not sure—they were paid a thousand dollars, and then a couple of days later, they paid back a thousand dollars—

"Mr. Canales [defense counsel]: Your Honor, I object to this line of arguments, Your Honor. He's outside the record. What somebody else did or a contribution has no relevance at all regarding our client.

"The Court: Where is this, Mr. Wolfe?
"· · · ·

"Mr. Wolfe: Government's Exhibit No. 3, Your Honor.
"· · · ·

"The Court: How are you tying that to this case?

"Mr. Wolfe: It goes to the weight of this document, it goes to what is contained in this document, and it is in evidence, and everything that's in evidence is allowed to be explained to the jury.

"The Court: Well, yes and no, gentlemen. Because it's in evidence doesn't mean it's got anything to do with this particular case.

"I say to you ladies and gentlemen of the jury, again, we're not here to try Duval County in the abstract, we're not here to try South Texas politics, we're not here to decide if there was some wrongdoing somewhere in the campaign. We're here to decide if these two people are guilty of the precise charges.

"So I would say to you, Mr. Wolfe, stay on that.

"There may be other people who are guilty of something. One of the instructions I'm going to give you is not to consider or speculate about who else might be guilty of anything else, or what may or may not have happened to anybody else. What your solemn oath is to do here is to consider these two people only.

"Now, to the extent that the attorneys are arguing about motives of people who have come here to testify, I'll allow that, but to just get off into the general structure of Duval County politics, I think that is off the mark.

"Mr. Wolfe: Ladies and gentlemen, let me say this to you. You should not find these people guilty—find these people guilty because of Duval County, and I hope you don't think that's what I want you to do. And I know that, even if you thought that's what I wanted you to do, you wouldn't do it. That's not the reason they're on trial here. They're not on trial because of Duval County." (R. 865–67.)

A portion of this argument appears to have been a misinterpretation of the record. Government's Exhibit No. 3, a duly authenticated copy of the Uresti campaign report of expenditures, disbursements, and contributions which had been admitted in evidence (and as to which no complaint is made on appeal), showed in the list of disbursements on April 14, 1982 a one thousand dollar payment to "Aida H. Garza (Good Government Team)" for "Good Government Team Campaign Work," and, in the list of contributions, appearing on other pages, receipts from the "Committee for Better Government" on April 14, 1982 of "$1,149.50" described as "Fund Raising Activity" and on May 19, 1982 of "$1,000" described as "Loan from Bank." Apparently, the prosecutor's recollection of the exhibit merged the "Good Government Team" and the "Committee for Better Government" into the "Good Government League." But this misrecollection of the exhibit, which was available to the jury in its deliberations, is not significant, given that the exhibit clearly did show a receipt by Aida Garza and it was admitted that Aida Garza was a Uresti backer. As to the question of "extraneous offenses," this was inferential and attenuated and more than adequately addressed by the district court's instructions given in response to the objection, as well as by the prosecutor's last above-quoted statement. No further instruction or action by the district court was requested, and no motion for mistrial was made. We find no reversible error in this respect.

■ 4. The final set of complaints generally asserts that the prosecutor's argument was in essence a request that the jury convict on the basis of guilt by association, because of the supposed "reputation" of Duval County, particularly, and South Texas, in general, for "dirty" politics.

Initially, the context of the arguments must be considered. We have noted that counsel for Garcia first brought up the matter of Duval County, and claimed "innocent by association," because Judge Uresti was such "a good man," and because of

"the caliber of his supporters." [14] Similarly, counsel for Canales in his argument talked about the Texas Rangers and the FBI and how they would frighten people from "South Texas" and "poor Mexicans." [15] He questioned the motives of the prosecution ("why are they trying to put it on us?" (R. 834)) and took liberal common notice of how politics were conducted in "South Texas." [16] Taken together, there ran through these arguments an implicit theme of "South Texas," the good Judge Uresti and his high-caliber supporters against the world, particularly against those who were trying to put an end to the properly active politicking that was typical of South Texas, and against the Rangers who frightened the Spanish-speaking people there. Certainly, then, the prosecution was not barred from any mention in its closing argument of Duval County or South Texas or the Uresti organization, and was entitled to respond that a conviction was sought to stop vote buying, not legitimate politicking, and that this was for the good of the people of South Texas, rather than being a form of "outside" repression.

Turning to the specifics, we find that most of the instances complained of in this connection were references to persons shown by the evidence to be active in the campaign or organization of Uresti and his political allies. We do not find these improper, especially in a conspiracy prosecution where the defense had raised the claim of "innocent by association." Moreover, there was no objection to these portions of the argument.

We find only two complained of references in the prosecutor's closing argument to "South Texas" and only one to Duval County.

The first "South Texas" reference came in the portion of the prosecutor's argument concerning Ester Espinoza, the "complaining witness" in count two, on which the verdict was "not guilty." [17] There was no

---

**14.** Other examples of this, in addition to those previously quoted in the text, and of personal attacks on the prosecutor, include the following: "What [prosecutor] Jack Lamar Wolfe and his investigators are trying to do in this case is to convict these two ladies based on the fact that they are from Duval County, not based on any evidence ... but based on the fact that they're from Duval County" (R. 812–13); "What they're trying to do is stop them from ever politicking again" (R. 813); "the testimony was prepared by over-zealous investigation, again, of Duval County. Think about it, Duval County. You all have not ... have heard about Duval County and that's bound to play some sort of role. I want you all to take that out of your mind" (R. 820–21). *See also* the references to the argument of Garcia's counsel set out in the first paragraph of section III 3(b) of the text, *supra.*

**15.** "When a Texas Ranger comes in there, when a Texas Ranger comes up with his big 'pistola' ... you know, 'un rinche' at the door of Lillian Alaniz, with all those poor Mexicans, and you have a Texas Ranger knock on the door, with an F.B.I. guy.... Come on. I don't know about a single Texan from South Texas who doesn't quiver a little bit when a Texas 'rinche' comes to your house ...." (R. 838.)

**16.** "People of South Texas, you know where these things [campaign posters] go.... And I'll tell you one thing, there ain't a county judge's race in South Texas that ain't active. Isn't it active with C.Y. Benavides here in town? Isn't

it active in Zapata? Isn't it active in Starr? Isn't it active in Corpus in a county judge's race? I don't know why, but there's something about the county judge's race—I mean, they just spur all of us. We get excited ...." (R. 839–40.)

**17.** This portion of the argument was:

"Fito Saenz, Elijio Uresti, Aida Garza, Ruperto Canales, Armando Garcia, Olga Hinojosa, all the Urestis, Teresa Briones, they're all involved in this whole thing. And you can see the reasons. All this up here is not to show that these people are guilty, because the evidence shows they're guilty. These are to show the motives, what motivations to do what they do. What motivates them to take advantage of people like the poor people that had to come up here. And I'll tell you what, ladies and gentlemen *Mr. Canales* [defense counsel] *made light of it.* He smiled at you and he got you to joke around about it and everything else, but it's not a joking matter. *If there's anybody who deserves an award for bravery, it's Ester Espinosa* [*sic*]. Do you think that this is probably the most frightening thing that she has ever gone through in her life? Do you think she was scared when she came in here? Do you think she was frightened? Do you think she was intimidated?

"And when she goes back to San Diego, ladies and gentlemen, I'm not going back there with her. Mr. Marshall and Mr. Rodri-

objection to any of this, and the acquittal on count two indicates it was not prejudicial.[18]

In the portion of his argument containing the single complained of reference to Duval County, the prosecutor stated, just after the argument quoted in note 17, *supra*, as follows:

"Ladies and gentlemen, there comes a time when this stuff has got to stop, and when I talk about 'this stuff,' I'm talking about vote buying. To my knowledge, *I don't think anybody has ever been prosecuted in Duval County for vote buying.* As a matter of fact, ladies and gentlemen—

"Mr. Canales: Your Honor, I'm going to object to that type of line of arguing. He's arguing outside the record and it's improper.

"The Court: Yes, I'll sustain that. Let's don't try the history of South Texas on either side, ladies and gentlemen. The point is, are these two defendants guilty or not guilty of the specific charges against them. Let's limit that to the issue." (R. 863) (emphasis added).

This argument was improper, as there was no evidence of whether this was the first such Duval County prosecution (apparently it was *not* the first, *see* note 2, *supra*). However, we feel that the district court's prompt instruction cured any error. We note there was no request for any other or further instruction, and no motion for mistrial. Further, the defense had already brought up Duval County several times, and had also intimated that this was an improperly motivated prosecution de-

signed to stop legitimately active South Texas politicking. Moreover, it is not clear that the alleged fact that the prosecution was the first, as opposed to following several others, was prejudicial to the defendants.

The final complained of reference to South Texas occurred in this context:

"[Prosecutor]: We've got a cancer right here, ladies and gentlemen, and it's going to hurt, and it's going to be difficult to cut it out, and you're going to agonize over it, but if you don't cut it out, ladies and gentlemen, it's going to grow and it's going to grow until it consumes us on, to where no election is free. If you want to *send a message out to the people of South Texas, that vote buying is going to stop—*

"Mr. Canales [defense counsel]: Your Honor, I object to his general law enforcement arguments, Your Honor, about sending out a message to South Texas, Your Honor.

"The Court: Look, ladies and gentlemen, I have always understood in closing arguments, to allow a certain amount poetic license. I would simply repeat to you, and I think I've said this enough for you to understand, you are here, in the final analysis, to try these two people. You're not here to try Judge Uresti, you're not here to try Duval County, you're not here to try the cancer of vote buying. You are here to try two people, as to whether or not they are guilty of the precise charges involved. The rest of it I regard as—on both sides—as dramatic license, poetic license, and I don't

guez are not going back to San Diego. *She's going back there by herself, back into the very mi[d]st of an environment that is completely controlled* that she came in here to testify against. If she had a motive for anything, ladies and gentlemen, she had a motive to come in here and tell you that they didn't do it, but give her her self respect. If you return a verdict of guilty in this case, *you're telling people like Ester Espinosa, and you're telling all the others in South Texas that are taking advantage of you,* that if you come foward [*sic*] and tell us the truth, we're going to believe you and we don't care if you're intimidated, and we don't care if you're afraid, and

we don't care if people make a fool of you and make you look bad because we know you're telling the truth." (R. 862–63) (emphasis added).

**18.** For the same reasons, we decline to sustain the complaints concerning the references in this argument to defense counsel and to "an environment that is completely controlled." We also note that there was some evidence to support the latter characterization, and the argument was a response, albeit an ultimately unsuccessful one, to the heavy defense attack on Espinoza's credibility and character.

think it's particularly prejudicial, but to the extent that it digresses you from your task, I remind you again that your task is simply to go in here and try these two people. Your task is not to clean up all corruption in the world from now and ever more. Your task is to try these two people on the particular charges brought against them." (R. 874–75) (emphasis added).

It is not entirely clear to us that the remark about "send a message out to the people of South Texas" did not "fall into a polyphonic interlude between an improper plea for conviction ... and a permissible plea for law enforcement." *Whittington v. Estelle*, 704 F.2d 1418, 1423 (5th Cir.), *cert. denied sub nom. Whittington v. McKaskle*, — U.S. —, 104 S.Ct. 428, 78 L.Ed.2d 361 (1983). *See also United States v. Phillips*, 664 F.2d 971, 1030 (5th Cir.1981), *cert. denied sub nom. Meinster v. United States*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982) (may appeal to jury to act as conscience of community). Even if the argument did go beyond the proper limits of a plea for law enforcement

or an appeal to the jury to act as the conscience of the community, it did not do so egregiously. Considering the court's ample and prompt curative instruction, going well beyond a perfunctory "sustained" or "disregard that," and the fact that no other or further instruction was requested and no motion for mistrial was made, we conclude that no reversible error is presented.

■■■■■ Other complaints of the prosecutor's closing argument present no grounds for reversal.[19]

■■■■■ 5. We turn now to certain factors, common to most of appellants' claims of improper argument and alleged prosecutorial misconduct, which strengthen our conclusion, based on the record as a whole, that none of the complained of incidents presents reversible error. We recognize that the cumulative effect of several incidents of improper argument or misconduct may require reversal, even though no single one of the incidents, considered alone, would warrant such a result. The follow-

**19.** Complaint is made of the prosecutor's reference to the check writing routine of the Uresti campaign, whereby Gongora would write checks as directed by others, such as the judge's secretary or Genoveva Garcia, but never knew what they actually were for, and signed many in blank; the campaign treasurer, campaign manager, and Judge Uresti himself were not overtly involved in the procedure. The prosecutor commented, "You see, that's how the judge and the people would go out and buy votes and insulate themselves. You see, they have other people who do the things where you have to sign their names. They have people like this to go out and do the actual vote buying." (R. 850.) There was no objection to this argument and we believe it was in general a proper comment on the evidence and reply to the argument about how good Judge Uresti and his supporters were and how much Judge Uresti had done for the county.

Complaint is also made of the following argument of the prosecutor:

"You know, I'll tell you one of the things that made me so sick in this trial. You see those witnesses take the stand—and did you see the hate that they had for them? Did you see how, if the [*sic*] made a mistake—poor Nancy said that she couldn't and did you see how they laughed? Did you see how—

"Mr. Canales: I object, Your Honor. He's arguing outside the record, Your Honor.

There's no evidence of that anywhere, Your Honor.

"The Court: Well, I think that's well taken, Mr. Wolfe. I don't know who was laughing or not laughing, but let's stick to the evidence. We're not here to impugn the integrity of anybody in the audience or anything of that sort. Let's stick to the evidence. Go ahead.

"I instruct the jury to disregard that part." (R. 860–61.)

We believe that the instruction cured any error here, which in any event was not of a nature to be significant to the result.

Finally, appellants call attention to the following argument:

"[Prosecutor]: I know, when you go into the jury room, you're going to look at all that evidence, and I know you're going to agonize on it and I know it's difficult. It's just like when you have to find out that somebody you know has cancer, and you know that they're going to go in for an operation, and you know it's going to be painful and it's going to hurt." (R. 873–74.)

This was a proper plea for the jury to do its duty, based on the evidence, no matter how difficult or painful. The district court did not err in overruling defense counsel's objection to this argument.

ing factors, when considered together with our foregoing analysis, also persuade us that no such "cumulative" error is present here.

To begin with, except for one or two incidents which are either trivial or as to which appellants' complaints are clearly without any merit, each instance of which complaint is made on appeal involves a situation where appellants either made no objection whatever or where the objection they did make was sustained and an appropriate, nonperfunctory, and meaningfully curative instruction was promptly given. In none of the latter instances, moreover, did appellants request any further instruction or in any way indicate any dissatisfaction with the action of the district court. Further, and of particular significance, neither appellant at any time moved for a mistrial. "Our review is therefore limited to the plain error standard ...." *United States v. Montemayor*, 684 F.2d at 1124. As we stated in *Montemayor*:

"Plain error may be recognized 'only if the error is so obvious that our failure to notice it would seriously affect the fairness, integrity, or public reputation of judicial proceedings and result in a miscarriage of justice.' *United States v. Graves*, 669 F.2d 964, 971 (5th Cir.1982). The defendant's burden of showing plain error is a heavy one. *United States v. Pool*, 660 F.2d [547] at 559 [5th Cir. 1981]." *Id.*

We stress the importance of making proper objection and, if the objection is sustained and the jury instructed accordingly, expressing to the trial court any desire for further instruction or for a mistrial. Though the reasons for this are obvious, some of them bear repeating. When we are asked to reverse in these circumstances we are, in effect, asked to go against the implicit judgment of both the trial court and the defendant's trial counsel that the trial court's corrective action was adequate and appropriate. Moreover, we are reluctant, particularly where, as here, there has been a strong curative instruction and it is obvious that the prosecution is not seeking to "force" a mistrial, to allow the defense to avoid making the choice, prior to verdict, between another trial and a decision by the jury which has already commenced to hear the case. We observe that defendants here were represented by vigorous, aggressive, and capable counsel, Canales' counsel having formerly served as United States Attorney for the district in which trial was held.

We are unable to conclude that an affirmance here works either a miscarriage of justice or tends to have a serious adverse effect on the fairness, integrity or public reputation of judicial proceedings.

Next, we consider the curative instructions given by the district court. We have already adverted to several of these, and will not repeat them. There were others, however, which also effectively and concretely focused the jury's attention on its proper duties in this case, and emphasized the necessity to put aside any and all extraneous factors.

Just prior to final arguments, the district court instructed the jury, "these statements that you're going to hear, these arguments, are not evidence. Of course, the evidence is over with ... [the arguments] are not designed to put any new evidence in the case; they are not designed to be your legal instructions.... The legal instructions that I give are the only ones that you follow ...." (R. 797–98.)

We have noted that on at least five occasions during the final arguments the court instructed the jury that Duval County, South Texas, and the misconduct or otherwise of other persons were irrelevant, the sole and only issue being the specific defendants' guilt of the specific charges in the indictment. (R. 816, 861, 863, 866–67, 875; *see also* the prosecutor's above-quoted express disavowal, at R. 866–67, of any Duval County-type guilt by association theory.)

In its final charge to the jury, the court carefully and forcefully reemphasized these themes, as reflected by the following portions of its instructions:

"... It is your duty to base your verdict solely upon the testimony and the evi-

dence without prejudice, without bias, and without sympathy to anyone.

"The arguments were very emotional and bordered sometimes on bias, or prejudice, or sympathy. I say, 'bordered.' I don't think they overdid it, but sometimes they're talking about different people, or whether they're ... what their backgrounds are, or where they're from, and that sort of thing, whether it's the defendants or the witnesses. Some of that is relevant to decide credibility, who you believe and who you don't believe, but in the final analysis, we're not here to be sympathetic to anyone, we're not here to be prejudice[d] against anyone, we're not here to have a bias one way or the other. You're here to decide the case strictly according to the evidence, and that was the promise you made and that was the oath you took before being accepted by the parties, and they have the right to expect nothing less. [R. 878–79.] [20]

" . . . .

"Now you must consider only the evidence.... [T]he sworn testimony given at this trial by the witnesses, plus the exhibits. That's what we mean by 'evidence.' Remember again that any statements, objections, or arguments by the attorneys are not evidence.... [I]t is your own recollection of the evidence, and it is your own interpretation of the evidence that is controlling. [R. 882.]

" . . . .

"The point I want to make to you is that it's not a question of ... are they guilty or not guilty in general, in some kind of abstraction. It's a question of ... is Aurora Canales guilty or not guilty of count one? Next question: Is she guilty or not guilty of count three?

"And, in a separate analysis, Elia Garcia. Is she guilty or not guilty of count one? Then the next one, count two and count three. And your findings of any one of those does not necessarily control the other.

"I caution you and I stress to you that you are here to decide the guilt or innocence of these two ladies from the evidence in this case. They are not on trial for any act or conduct or offense that is not alleged in the indictment. You are not here called upon to return a verdict as to the guilt or innocence of any other person or persons that are not on trial. You should not speculate as to the status or disposition of the case as to anybody else. I want to stress that in view of some of the closing arguments on each side. While they were enlightening, interesting in the final analysis, I want to repeat to you again, it's simply a question of ... are these two ladies guilty or not guilty, from the evidence, on the precise count they're charged with. You're not here to decide whether the Texas Rangers are a good idea or a bad idea. We're not here to talk about the F.B.I.'s investigating techniques. We're not here to decide if Duval County has good people or bad people. We're not here to ... [right] all the wrong history. We're not here to generally clean up corruption or send messages or anything of that sort, one way or the other. We're not here to be sympathetic to people who are nice and have families and children, or anything of that sort. We're simply here to decide whether the government has proved that these two ladies are guilty of the particular charges against them.

"So the rest of that stuff should be disregarded by you except and only ex-

---

20. The court went on at this point to instruct on the presumption of innocence and the requirement of proof of guilt beyond a reasonable doubt, including the following:

"Now, the indictment that I will send with you is the formal charge against these defendants, but that indictment is not any evidence of their guilt. In fact, as you know, and as I think I've told you on several occasions, these defendants are presumed to be innocent. The law does not require them to prove that they're innocent, and the law does not require them, in fact, to produce any evidence at all. The government has the burden of proving that they are guilty beyond a reasonable doubt, and if the government fails to do that, then you have to acquit the defendants." (R. 879.)

cept insofar as you find it relevant in some of the instances, as far as just evaluating the credibility or motives or that sort of thing as to people who actually appeared here in this case.

"But other than that, this is not a court of inquiry. We're not here generally to wonder if these two people—and I stress to you again to disregard and not even try to speculate what other people might've done, or what other involvements they might've had, or anything of that sort. [R. 906–07.]

" . . . .

" . . . [Y]ou're here to only decide whether the government has proved the case beyond a reasonable doubt. [R. 908.]

" . . . .

"Remember that you are not partisans. You are judges of the facts and your interest is to seek the truth." (R. 909.)[21]

We believe these instructions, coupled with those previously referenced, were more than sufficient to render it most unlikely that appellants were materially prejudiced by the matters complained of.

 Partial confirmation of this conclusion is found in the jury verdict, returning an acquittal on count two, where the government's evidence was weaker, and a conviction on counts one and three, where the proof of guilt was stronger. This tends to indicate that the jury based its verdict on the evidence, and was not swayed by the fact that this was a Duval County case or by a desire to send a message to the people of South Texas, which considerations, of course, applied as much to count two as to the other counts. Indeed, much of the complained of argument was particularly related to count two (see, e.g., note 17, supra).

Finally, we have considered the record as a whole, the proof of guilt and the overall manner in which the trial was conducted. While the proof of guilt was not overwhelming it was, on count three at least,

substantially above the level of minimal sufficiency. In our opinion, the trial was fair. The record does not reflect that the case was prosecuted on a guilt by association theory. The trial judge handled the case in an outstanding manner, giving the attorneys proper latitude to present their respective cases but always retaining ultimate control and, in a fully evenhanded and fair manner, seeing to it that the trial moved along and remained focused only on the real issues, whether the government proved beyond a reasonable doubt that the named defendants individually were guilty of the precise matters with which they were charged.

Accordingly, we find no reversible error in the appellants' complaints of the prosecutor's jury argument and related instances of claimed misconduct.

## IV.

### CLAIMED INSTRUCTIONAL ERROR

 The last claim of error relates to a statement by the court, in its final charge to the jury, respecting the federal election element of the offenses charged. The court instructed that the election had to be at least in part a federal election, but that the conduct alleged did not itself have to affect or relate to federal positions on the ballot. It then gave the now complained of instruction:

"So that all you have to be satisfied of—and I suggest, in this case, it's really not disputed—is that, in that particular election, there was a federal race going on. There were actually two, as I recall [one for senator and one for congressman]. . . . So that I suggest to you that the government has probably proved that one element in the case. But I'm just telling you, for your information, that that is the law. The government has to prove that the election did, at least in part, involved federal officials, but does not have to prove that the actual activity

21. There were no objections to the charge and only a single requested additional instruction, concerning a minor unrelated matter, as to which defense counsel's request was granted.

was directed towards the federal race." (R. 891–92.)

It is claimed that the above-quoted instruction amounted to a directed verdict, or an improper comment on the evidence, with respect to whether the election included one or more federal positions.

We note that the court did not fail to instruct the jury on the federal election element of the offense and did not withdraw that element from the jury's consideration. The jury was expressly told that it "[had] to be satisfied" that "there was a federal race going on" and that "the government has to prove that the election did, at least in part, involve[ ] federal officials." And at another place in the charge,[22] the court told the jury:

"... [W]hat the government has to prove on counts two and three against each defendant, beyond a reasonable doubt, is the following: number one, ...; number two, ...; and, number three, that the payment or the offer to pay was made to a voter in connection with a general, special, or primary election which, at least in part, was for the purpose of selecting or electing a federal official ...." (R. 890.)

Further, the court expressly told the jury at the beginning of the charge:

"... I have the right to give my own summary and analysis of the evidence and even that wouldn't be binding [on you]. It is your own analysis. You are the supreme judges of the facts. The only thing you have to accept from me are my legal instructions." (R. 883.)[23]

Of course, it is settled, as the district court instructed the jury here (see note 22, supra), that "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." Cupp v. Naughten, 414 U.S.

141, 146–47, 94 S.Ct. 396, 400–01, 38 L.Ed.2d 368 (1973).

While the trial court may under no circumstances withdraw any element of an offense from the jury's consideration in a criminal case, nevertheless the judge may comment on the evidence, so long as he instructs the jury that they are not bound by his comments. United States v. Johnson, 718 F.2d 1317, 1324–25 (5th Cir.1983). The trial judge here did not transgress either of those lines.

■ A trial judge's comments on the evidence may also be error if they "seriously prejudice the defendant." Id. at 1325. We discern no such prejudice here. There was clear, positive, unimpeached, and uncontradicted evidence that this was a federal election at which there was a contested race for United States senator and an election for the United States House of Representatives. That this was so was not in any sense a contested issue at trial. See Horning v. District of Columbia, 254 U.S. 135, 138, 41 S.Ct. 53, 54, 65 L.Ed. 185 (1920) (where there is no dispute in the evidence, judge may so state); id. at 139, 41 S.Ct. at 54 (dissenting opinion; in criminal case the "judge may ... express his opinion whether facts alleged have been proved"); United States v. Natale, 526 F.2d 1160, 1167 (2d Cir.1975), cert. denied, 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976) (where evidence is undisputed as to certain elements of offense, judge may say so). Under the circumstances, there is no meaningful possibility that the verdict would have been otherwise had the now complained of comment not been made. Thus there was no serious prejudice to the defendant. Finally, we note that no objection was made to this portion of the charge (see note 21, supra). The instant complaint does not present "plain error" as defined above. See Montemayor at 1124. See also Johnson at 1325 n. 23; Fitzgerald v. United

---

22. We also note the court's instruction that "you must follow all of these instructions as a whole, you have no right to disregard or pay special attention to any one instruction ...." (R. 878.)

23. The court also carefully instructed the jury at length that it was not to consider any of the court's rulings on evidence or statements to counsel or questioning of witnesses as reflecting any opinion as to what decision it should render on the matters submitted to it. (R. 883–84.)

*States,* 324 F.2d 153 (5th Cir.1963) (per curiam), *cert. denied,* 376 U.S. 944, 84 S.Ct. 798, 11 L.Ed.2d 768 (1964).

We reject appellants' complaint of the charge.

## CONCLUSION

Having determined that none of appellants' complaints presents any reversible error, the judgment of the district court is affirmed.

AFFIRMED.

GARZA, Circuit Judge, dissenting.

I respectfully dissent. Under the evidence adduced by the government in this case, the defendants, Aurora Canales and Elia Garcia, could not possibly have been guilty of vote buying or conspiring or offering to buy votes in violation of 42 U.S.C. § 1973i(c) and 18 U.S.C. § 371.

Our inquiry as to why the defendants took Lillian Alaniz and her son Jose and daughter Nancy to vote absentee has to begin with whether or not the request for "Aurora" (Aurora Canales one of the defendants) to come take Lillian Alaniz to vote absentee came from Lillian Alaniz herself or not. The majority in their footnote 6 allude to the testimony of Adriana Hinojosa. Mrs. Hinojosa testified that she, at the time of the event, was a school teacher in the Harlingen, Texas Independent School District but that her permanent home was in San Diego, Texas. She had come home during the Easter holidays and was in San Diego on Good Friday, Saturday, Sunday, Monday and Tuesday of the Easter holidays, that she was staying at the home of her sister Mrs. Irma Uresti and had volunteered to work in the campaign of County Judge Gilberto Uresti. She testified that on the morning of April 13 she received a call from a woman that identified herself as Lillian Alaniz to have "Aurora" to take her to go vote. She produced a memorandum she had made of the call at the time. She assumed that "Aurora" referred to the defendant, Aurora Canales, as she was the only "Aurora" whom Adriana knew was working in the campaign. In footnote 6

the majority says Mrs. Alaniz did not recall speaking to her on the telephone the day she voted and that she also testified she did not remember calling anyone to be picked up to vote. It is true that many times she said she didn't remember when it would have been so easy for her to say "I did not do it." During her cross-examination, the following questions and answers were asked and given:

Q. Do you remember on the day that you voted, on that very same day, calling Irma Uresti's home and say, "send somebody to pick me up and take me to vote"?

A. In the absentee?

Q. Yeah, in the absentee.

A. Maybe I did.

R. 201. Both defendants Aurora Canales and Elia Garcia testified that they received the information about the call that Lillian Alaniz made. Under the testimony I cannot perceive of any reasonable juror not concluding that Mrs. Alaniz did initiate the request for the defendants to come to take her to vote and that that was the reason that the defendants went to the home of Lillian Alaniz.

Our next inquiry should be as to what transpired when the defendants arrived at the home of Mrs. Alaniz pursuant to her request. Mrs. Alaniz testified that she asked the defendants if they were giving any money and they told her that they were not. I believe it is very clear from the testimony of Mrs. Lillian Alaniz and the two defendants that both defendants told Lillian Alaniz that they were not paying for any votes. The only two witnesses who testified differently were her son Jose and her daughter Nancy, whose testimony in this regard is quoted in the majority opinion. They both essentially testified that they were offered money for their votes. Judge Kazen himself did not believe their testimony because he granted motions of acquittal as to substantive counts charging the defendants with paying or offering to pay Jose and Nancy Alaniz money for their votes. Mrs. Alaniz testified that after the

defendants said they were not paying for votes she told them that she needed $30 to make a payment and that the defendants said they would try and help her out but that they would have to check with Gilbert Uresti first. Another daughter of Mrs. Alaniz, Betty Briones, who was present, testified that after her mother said she needed $30 for a payment, Mrs. Canales said that she had to talk to Mr. Uresti about that but she wouldn't promise anything. R. 340.

It is amply clear that after the conversation at the Alaniz home that Mrs. Alaniz, her daughter Nancy, and son Jose went to vote absentee. That they did not receive any money before they voted is clear and beyond any doubt.

Our next inquiry should be as to whether or not the $30 check from the Uresti campaign fund, which showed that it was for campaign work, was payment for any offer to pay for their votes before they voted absentee, or whether it was money paid by campaign funds for campaign work as the check stub showed.

At the time of the direct examination by the prosecutor of Lillian Alaniz, she was asked:

Q. Were you paid $30 in exchange for your vote?

A. Yes, sir.

R. 240. I have no idea why defense counsel did not object to this question since it was the ultimate issue before the jury. The question for them to decide was whether she was paid for her vote or for working in the campaign. The court below should have seen this and should not have allowed the question or the answer to be before the jury. The record shows on many other occasions the court intervened so as to not allow improper questions to be asked by both the prosecution and the defense and why nothing was done by anyone with regards to the above question and answer is beyond me.

Our next inquiry should be whether there was any basis for the check of $30 given out of the Uresti campaign fund having been given for campaign work as alleged by the check stub or in payment for voting.

Mrs. Alaniz testified that she did call for Uresti campaign material. The evidence is unclear as to whether she called the day she voted or the day after. The record shows that it was either the day she voted or the day after she voted that Mrs. Alaniz called for the campaign material. The campaign material was delivered to her by Teresa Briones and it had to be before the $30 check was delivered to Mrs. Alaniz by whomever it was delivered. Mrs. Lillian Alaniz said that the check was delivered to her by Aurora Canales. On cross-examination of Mrs. Lillian Alaniz the following questions and answers were brought out:

Q. No other money was given to you except that $30 check?

A. Yes, sir.

Q. After Ms Canales left, did Teresa Briones or Santos Garza ever come back to see you?

A. No.

R. 229. This testimony shows that she had already received the campaign material she had requested before the $30 check for campaign work was delivered to her.

The majority opinion makes a big to-do about whether working on the campaign was discussed by the two defendants and the Alanizes before they went to vote, as the two defendants testified. The majority says that none of the Alanizes testified that they discussed campaign work before they went to vote absentee. Jose Alaniz, on cross-examination, testified:

A. Yes, well, my mom called a friend of hers and she told her if she could give her some posters and some stickers to hand out.

Q. Did you agree to hand out some of these stickers and posters?

A. No. We just threw them away.

Q. Did anybody ask you to give these posters out in the neighborhood?

A. Yes. they told us to give them away to our friends in the neighborhood or any place.

Q. Who told you that?

A. I can't remember the ones who brought the posters.

Q. And you agreed to pass them out in the neighborhood?

A. Yes, but I didn't pass them.

Q. But you told them that you were going to pass them?

A. Yes.

Q. And why did you not pass them.

A. Because my father told me that if I would pass them out that I would get in trouble.

Q. And what did you do with the material?

A. Well, we just put it away. Then we gave away some ... about only two posters and stickers.

Q. All right. And who did you give away—stickers or sticks?

The Court: Stickers.

A. (Witness resuming) Stickers.

Q. All right. And who gave away those posters?

A. I gave it away to a friend of mine.

Q. Now, was this during the day, or close to the day that you went to vote?

A. It wasn't that same day. I think it was the other day, after we voted absentee.

Q. After you voted absentee somebody came over and left the material?

A. Well, my mother called them if they could bring some posters and some stickers.

R. 292–293. I think the evidence is clear that when Lillian Alaniz said she needed $30 for a payment the two defendants in this case said they were going to try to help her out but would not promise anything. They testified that they went to the campaign headquarters and told the people there about their conversation with Lillian Alaniz, that she needed $30 and that she was willing to work in the campaign. There is no question that Lillian Alaniz called for campaign material and the only reason that it was not distributed around the housing project where they live was that Lillian Alaniz's husband did not want them to do so. The evidence is consistent with what the defendants testified that they had discussed and the testimony of why a $30 check for campaign work was issued from Uresti campaign funds.

When you hire people to work in your campaign you expect them to vote for your candidate.

In this day of political action committees spending money in all directions trying to get their candidates elected, I am afraid that the statute involved in this case could be used in accusing people who put out campaign funds for paying for the votes of those they hire.

In this case, the government testified that the Department of Justice has a policy of not prosecuting those that sell their votes for pay even though the statute makes such action a crime.

At oral argument in this case, I expressed my concerns to the counsel for the government of my fears that those who expend campaign funds might be accused of buying votes just because they hire someone to work in the campaign. I told the Department of Justice attorneys that I would send anyone to the penitentiary whom they showed me had paid money for a person to go vote for their candidate, but that under the facts of this case I did not believe that the government had proved that these two defendants paid or offered to pay anyone for their vote. I still believe that the record fails to prove the facts necessary to convict these two defendants and I would reverse this case and order the entry of a verdict of acquittal. If the Government can have a policy that they will not prosecute those receiving pay for their votes, they should have a policy not to prosecute when campaign funds are used to hire campaign workers.