UNITED STATES of America,
Plaintiff–Appellee,

v.

Joe Henry CARTER, Jr., Joseph Estel
Hammack, Defendants–Appellants.

No. 90–1903.

United States Court of Appeals,
Fifth Circuit.

Feb. 12, 1992.

Rehearing and Rehearing En Banc
Denied March 25, 1992.

Alex R. Tandy, Fort Worth, Tex., for defendants-appellants.

Timothy W. Crooks, Asst. Federal Public Defender, Fort Worth, Tex., for defendant-appellant Joseph Hammack.

Frank D. Able, Asst. U.S. Atty., Marvin Collins, U.S. Atty., Fort Worth, Tex., for plaintiff-appellee.

Before REYNALDO G. GARZA and GARWOOD, Circuit Judges, and MAHON *, District Judge.

GARWOOD, Circuit Judge:

Defendants-appellants Joe Henry Carter, Jr. (Carter) and Joseph Estel Hammack (Hammack) were convicted of conspiring to manufacture amphetamine and of possessing, and conspiring to possess, phenylacetone with the intent to manufacture amphetamine. They both appeal, raising various challenges to their convictions and sentences. We affirm.

**Facts and Proceedings Below**

Viewed most favorably to the government, the evidence reflected the following.

Officer Brad Johnson (Johnson) of the Fort Worth Police Department and the Tarrant County Narcotics Intelligence Task Force received a tip from a confidential informant that there was a possibility that an amphetamine laboratory was being operated at the residence at 2418 Old Fort Worth Highway in Parker County, Texas. The informant further indicated that the residence was being occupied by Carter, who was known to Johnson and the other members of the police force, and by a woman named Paula. Johnson relayed this information to several other officers with the Fort Worth Police Department who were assigned to a Drug Enforcement Administration (DEA) Task Force. The officers drove and walked by the house, but could not detect any chemical odor of the type associated with the manufacture of amphetamine, methamphetamine, or phenylacetone. However, a background check revealed that the Dallas County Sheriff's Office had an outstanding felony arrest warrant for Carter. Johnson placed a telephone call to the house at about 12:30 a.m. on July 11, 1990 and asked the female who answered whether "Joe" was there. Based on her response, Johnson and the other officers drove to the residence to execute the arrest warrant.

Once they got onto the property surrounding the residence, the officers could detect the chemical odor characteristic of amphetamine reactions. Johnson and another officer went to the front of the house, while Johnson's partner Scott Campbell (Campbell) and a fourth officer went around to the rear. As Johnson was nearing the front door, he heard noise from the rear of the house, and he heard Campbell yell "Stop, Police!" Johnson kicked in the front door, and inside he found Carter lying on a mattress on the floor with a woman who identified herself as Paula Henderson (Henderson). There was an empty holster near the mattress, and Johnson asked Carter where the weapon was. Carter told him it was beneath the mattress, and Johnson found there a loaded RG model .357 magnum handgun.

* Senior District Judge of the Northern District of Texas sitting by designation.

Campbell testified that as he rounded the rear corner of the house, he saw a shadow in the shed located behind the house. When he shined the flashlight in that direction, he saw that it was a person exiting the shed. After Campbell identified himself as a police officer and told the person not to move, the person broke and ran toward the back of the yard. Campbell overtook him, wrestled him to the ground, and handcuffed him. Campbell again identified himself as a police officer and read the suspect his rights. The suspect, who did not make any statement to Campbell, was later identified as defendant-appellant Hammack. Campbell shined his flashlight inside the shed and saw what he believed to be a phenylacetone reaction—a round flask filled with chemicals on a heating mantle, with condenser tubes above the flask. He also saw a lounge chair laid out flat with a pillow and a blanket on it.

After obtaining a search warrant, the officers returned to the residence and conducted a search. In the rear bedroom of the house they found a distillation apparatus that was still slightly warm to the touch. They took a jar of brown liquid from the bedroom, which a DEA chemist determined to be amphetamine. In the same room they found a billfold with identification belonging to Hammack. In the shed behind the house, liquid that was later determined to be phenylacetone was boiling in a flask. And in a camper shell behind the house they found numerous precursor chemicals customarily used in the amphetamine manufacturing process.

On July 24, 1990, a federal grand jury returned a three-count indictment against Carter, Hammack, and Henderson. Count One charged all three with conspiracy to manufacture amphetamine and to possess phenylacetone with intent to manufacture amphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Count Two charged the three with possession of phenylacetone with intent to manufacture amphetamine, in violation of 21 U.S.C. § 841(a)(1). Count Three charged Carter and Henderson with carrying a firearm in connection with a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1). Carter and Hammack were tried together before a jury. At the close of the evidence, the district court granted Carter's motion for a judgment of acquittal on Count Three. Carter and Hammack were convicted on the other two counts. Carter was sentenced to 190 months' imprisonment and Hammack to 162 months', with both defendants to serve a term of supervised release and pay a special assessment. Both defendants appeal.

## Discussion

Carter and Hammack both challenge the sufficiency of the evidence to sustain their convictions. In addition, Carter contends that the district court erred in: (1) allowing the government to elicit evidence that Hammack had previously been convicted of a misdemeanor weapon offense; (2) failing to instruct the jury not to consider evidence of the presence of a firearm in his house for any purposes whatsoever; (3) applying sentencing guidelines relating to a firearm offense under 18 U.S.C. § 924(c); and (4) departing upward from the sentencing guidelines in imposing sentence. Hammack joins in Carter's first argument, challenging the admission not only of his weapon conviction, but also of four prior narcotics convictions, and arguing that introduction of the evidence of the weapon conviction was effected by deception amounting to prosecutorial misconduct. He additionally argues: (1) that in referring to, and eliciting testimony about, his silence after he received *Miranda* warnings, the prosecutor deprived him of due process under *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); (2) that the prosecutor during closing argument impermissibly sought to bolster government witnesses and to inflame community passions and prejudices; and (3) that the decision to refer his case for federal rather than state prosecution, made without reference to any objective or reviewable standards, violated due process.

Hammack's allegation of *Doyle* violations presents by far the most substantial point of error. We reserve discussion of it until after disposing of the other issues.

### I. Sufficiency of the Evidence

On appeal this Court must view the evidence and all reasonable inferences in the light most favorable to the verdict, and decide whether a rational trier of fact could have found that the evidence established the essential elements of the offense beyond a reasonable doubt. *United States v. Diaz–Carreon,* 915 F.2d 951, 953–54 (5th Cir.1990).

■■■ In a conspiracy prosecution under 21 U.S.C. § 846, the government is required to prove (1) the existence of an agreement between two or more persons to violate the narcotics laws, (2) that each alleged conspirator knew of the conspiracy and intended to join it, and (3) that each alleged conspirator did participate in the conspiracy. *United States v. Juarez–Fierro,* 935 F.2d 672, 677 (5th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 402, 116 L.Ed.2d 351 (1991). All elements may be inferred from circumstantial evidence. *Id.; United States v. Espinoza–Seanez,* 862 F.2d 526, 537 (5th Cir.1988). In drug conspiracy cases the government need not prove an overt act in furtherance of the conspiracy. *United States v. Mollier,* 853 F.2d 1169, 1172 (5th Cir.1988).

The crux of defendants' argument is that there is no evidence of any agreement between them or involving any other person. They rely on the principle that evidence merely showing presence at the site of a drug offense or association with the conspirators will not sustain a conspiracy conviction. *See, e.g., United States v. Onick,* 889 F.2d 1425, 1432 (5th Cir.1989); *Espinoza–Seanez,* 862 F.2d at 536–39; *United States v. Gardea Carrasco,* 830 F.2d 41, 45 (5th Cir.1987); *United States v. Blessing,* 727 F.2d 353, 356 (5th Cir.1984), *cert. denied sub nom. Rodriguez v. United States,* 469 U.S. 1105, 105 S.Ct. 777, 83 L.Ed.2d 773 (1985); *United States v. Jackson,* 700 F.2d 181, 185–86 (5th Cir.), *cert. denied sub nom. Hicks v. United States,* 464 U.S. 842, 104 S.Ct. 139, 78 L.Ed.2d 132 (1983).

In the cited cases, this Court reversed conspiracy convictions because the evidence did not satisfactorily establish that the defendants knew of the drug offense, even though they were present in an area where the drugs were located or some conduct related to the offense took place. Although Hammack offered a generally similar defense in this case, we conclude that the evidence here clearly permitted the jury to discredit his version of the events and infer his knowing participation in the conspiracy. Hammack testified that in July 1990 he was preparing to move to Pennsylvania and needed a place to stay for a few days while he awaited final approval for the move from his parole officer. He stated that from July 4th to July 7th he stayed with Carter and Henderson at the house at 2418 Old Fort Worth Highway and slept in the rear bedroom. After storing some of his personal belongings in that bedroom, he left and spent the next several days with his fiancee in Everman, Texas. Hammack stated that he returned to Carter's house on the evening of July 9th, but slept on a couch in a building behind the garage. When he went into the house the next morning to try to get some clean clothes that he had left in the rear bedroom, Henderson told him not to go into that room or the shed behind the house, because there were things in there belonging to one Keith Mahaffey that were not to be disturbed. Hammack testified that he detected a strange odor around the house and was concerned that something improper might be going on, but that he also thought that the odor might be coming from a garbage dump behind the house. He stated that he wanted to ask Carter about what was going on, but that Carter was gone all day on the 10th, and when he went into the house at about midnight on the 10th, Carter and Henderson were asleep in the living room. Hammack testified that, not wanting to disturb Carter, he went back out on the rear porch and was smoking a cigarette there when the police came and arrested him. He denied ever going into the shed or making any effort to elude the police.

Although Hammack's version offers an explanation of sorts for most of the circumstances linking him to the drug manufacturing operations at the house, it is implau-

sible in several respects and is at one point directly contrary to the testimony of one of the arresting officers. Hammack admitted to having used amphetamine in the past and to having been twice convicted for possession of amphetamine with intent to distribute, but testified that he had never been around anyone manufacturing amphetamine and did not know that the smell around Carter's house was from amphetamine reactions. Also, his version of events would compel the conclusion that all of the manufacturing equipment in the rear bedroom was set up between July 7th and July 9th, and that despite having put the equipment in the bedroom where Hammack's possessions were stored, Carter and Henderson wanted to keep the drug operations concealed from Hammack and would not let him reenter the bedroom to retrieve his clothes. We also note that a billfold with Hammack's identification was found in the rear bedroom on July 11, which is difficult to reconcile with Hammack's claim that he had not been in that room since he went to Everman on July 7. Finally, Hammack's testimony is directly contrary to Officer Campbell's statements that Hammack was inside the shed when he rounded the corner of the house, that Hammack was exiting the shed when he shined his flashlight on him, and that Hammack broke and ran as soon as he identified himself as a police officer.

■ Whether to accept Hammack's or Campbell's version of the events surrounding Hammack's arrest was a credibility determination within the province of the jury. *United States v. Molinar–Apodaca,* 889 F.2d 1417, 1423 (5th Cir.1989). Likewise, a jury could rationally and permissibly discredit Hammack's version of events in favor of a set of inferences that could be drawn from Campbell's testimony—namely, that Hammack was an active participant in the drug manufacturing operations at Carter's house, that he had set up a makeshift cot in the shed to tend the phenylacetone reaction, and that he was doing so while Carter and Henderson rested when the police arrived. The facts provide at least circumstantial evidence of all of the necessary elements of the conspiracy offense, including cooperation between Carter and Hammack that could constitute an "agreement." The evidence need not "exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *United States v. Bell,* 678 F.2d 547, 549 (5th Cir. 1982) (en banc), *aff'd on other grounds,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).

Although this Court in *Onick* did reverse a conspiracy conviction of a guest found in a house where drugs were kept for packaging, that case is a far, far cry from this one. In *Onick,* DEA agents raided a house to break up the suspected drug operations of its owner Tolliver, and as anticipated they found illegal drugs and paraphernalia concealed throughout the house. *See Onick,* 889 F.2d at 1428. In addition, they found Onick at the house dressed in her nightclothes. Several items in the house, such as women's clothes in the closet and a photograph of Onick and Tolliver, suggested her association with the owner Tolliver, but nothing suggested her participation in Tolliver's drug activities. The room in which she was found contained no drugs or drug paraphernalia. *Id.* at 1429. This Court held that there was no evidence of even a tacit agreement between Tolliver and Onick to violate the narcotics laws, and indeed, because the drugs and paraphernalia were concealed, it was not even clear that Onick was aware of their existence. *Id.* at 1432. Here, by contrast, several items of evidence very strongly link Hammack to the drug activities: the presence of the lawn chair and pillow in the shed, the relatively strong amphetamine odor throughout the premises, Hammack's prior experience with that drug, Hammack's billfold and identification in the rear bedroom where the distillation apparatus was still warm, and Campbell's testimony of Hammack's running from the shed, where the precursor was then cooking, and his continued flight despite Carter's command to stop in the name of the law.

■ As for Carter, the open existence of the then operating elaborate laboratory equipment in his house, and the odor of

amphetamine, is more than sufficient evidence to sustain the guilty verdict on the conspiracy count, notwithstanding that he was discovered in a different part of the house and that no direct evidence such as fingerprints linked him to the equipment. A conspiracy agreement may be tacit and may be inferred from circumstantial evidence. *United States v. Hernandez–Palacios*, 838 F.2d 1346, 1348 (5th Cir.1988). Even accepting *arguendo* the unsupported hypothesis that Hammack (or Mahaffey) was the owner and sole operator of the laboratory equipment, the evidence would still show that Carter cooperated in the scheme by making his house available for the illegal activities (and indeed guarding them by sleeping before the front door).

For similar reasons, Carter and Hammack cannot succeed in their arguments that the evidence of "possession" is insufficient to sustain their convictions under 21 U.S.C. § 841(a)(1) for possession of phenylacetone with intent to manufacture amphetamine. Constructive possession is defined as "ownership, dominion, or control over illegal drugs *or* dominion over the premises where drugs are found." *Onick*, 889 F.2d at 1429. A rational jury could certainly find that Carter, as the lessee of the premises at 2418 Old Fort Worth Highway and having stationed himself as a guard at the front door, exercised dominion over the entire property, including the shed behind the house. And Hammack's argument, again relying on *Onick*, is also wholly unpersuasive: whereas Onick was found in a room without any drugs or drug paraphernalia, Hammack—if Campbell's testimony is credited—was observed running from a room where a phenylacetone reaction was visibly in progress.

We conclude that the evidence was clearly more than ample to sustain both Carter and Hammack's convictions.

## II. Admission of Evidence of Hammack's Prior Convictions

Hammack made a pretrial motion *in limine* to prevent the government from using, either for impeachment purposes or as evidence of extrinsic offenses under Federal Rule of Evidence 404(b), his 1982 conviction for simple possession of marihuana or his 1986 conviction on four counts of possession of controlled substances. The magistrate ruled that the prosecution would have to inform the court out of the presence of the jury prior to introducing such testimony so that the parties could argue the motion *in limine* at that time.

At the beginning of the second day of trial, when Hammack's counsel informed the court that Hammack intended to testify on his own behalf, the government informed the court and defense counsel (out of the jury's presence) that it intended to establish on cross-examination that Hammack had been convicted of four felony offenses in January 1987, for possession of amphetamine with intent to deliver, possession of morphine, and possession of methamphetamine,[1] and that Hammack had been convicted in April 1990 of unlawfully carrying a weapon. The district court decided that the government could cross-examine Hammack about the 1987 drug convictions but not about the 1990 misdemeanor weapon offense, unless something in Hammack's testimony on direct examination made the 1990 conviction relevant.

On direct examination, Hammack was asked if he had recently been convicted of a crime. He replied that he had been convicted in 1989 of unauthorized use of a motor vehicle, served one year in jail, and then was paroled in January 1990. He stated that he immediately found a job with a clothing company in Fort Worth, which he held until the third week of June. At the conclusion of his testimony, the attorneys and the judge held a bench conference at which the prosecutor requested permission to examine Hammack about the 1990 weapon offense. The basis for his request was that Hammack had misled the jury by claiming to have been employed from January to June 1990, because the prosecutor could show that he had served 120 days for the April 1990 misdemeanor weapon convic-

---

1. Although there are discrepancies in the details, presumably these offenses were the ones referred to in the pretrial motion *in limine* as the four-count 1986 conviction.

tion. The court granted the request, finding that the witness had "opened the door." At that point defense counsel requested permission to reopen his questioning. He was allowed to do so, and Hammack stated that he had not served time for any offense since his parole in January. Defense counsel also asked him after reopening whether he had ever been involved with drugs, and Hammack admitted to having pleaded guilty in 1987 to a four-count charge of possession with intent to deliver, arising from incidents on four separate occasions.

On cross-examination, the prosecutor then asked Hammack if he had been convicted of unlawfully carrying a weapon on April 11, 1990, and sentenced to 120 days for the offense. Hammack replied that that was not what had happened; he had pleaded guilty to that offense after his release in January, but the offense had not occurred in 1990. The prosecutor then started to move on to a different subject. The judge immediately gave an instruction to the jury that the questions asked of witnesses were not themselves evidence. Shortly thereafter, defense counsel moved for a mistrial on the ground that the evidence of the 1990 conviction, which the court had ruled to be inadmissible, had been "back-doored" into the trial by the prosecutor as impeachment evidence, but had not impeached Hammack's testimony at all. The court denied the motion, but indicated that it would consider including a jury instruction on the matter if defense counsel so desired. No such instruction was ever requested.

On redirect, Hammack clarified that he had been arrested for carrying a knife in his boot in December 1988, that he had pleaded guilty to that offense in 1990 after his release from jail, and that the district attorney agreed to accept his time served on the unauthorized vehicle use offense for the weapon offense, so he did not even spend a night in jail as a result of the April 1990 conviction.

In this appeal, Hammack contends that the government committed prosecutorial misconduct warranting reversal by misleading the district court about the circumstances of Hammack's 1990 conviction in order to get it admitted into evidence.

■ This Court's task in reviewing a claim of prosecutorial misconduct is to decide whether the misconduct casts serious doubt upon the correctness of the jury's verdict. *United States v. Goff*, 847 F.2d 149, 165 (5th Cir.), *cert. denied sub nom. Kuntze v. United States*, 488 U.S. 932, 109 S.Ct. 324, 102 L.Ed.2d 341 (1988); *accord United States v. Stewart*, 879 F.2d 1268, 1271 (5th Cir.) ("[T]o warrant a new trial, prosecutorial misconduct 'must be so pronounced and persistent that it permeates the entire atmosphere of the trial.'" (quoting *United States v. Blevins*, 555 F.2d 1236, 1240 (5th Cir.1977), *cert. denied*, 434 U.S. 1016, 98 S.Ct. 733, 54 L.Ed.2d 761 (1978))), *cert. denied*, 493 U.S. 899, 110 S.Ct. 256, 107 L.Ed.2d 205 (1989). In making that determination, the Court is to consider: (1) the magnitude of the prejudicial effect of the statements; (2) the efficacy of any cautionary instructions; and (3) the strength of the evidence of the appellants' guilt. *Goff*, 847 F.2d at 165.

■ Applying those factors here, we conclude that any adverse effect to the defendant from the prosecutor's misrepresentations to the district court (whether accidental or deliberate) was not so great as to warrant reversal. The prejudicial effect of the evidence that Hammack was arrested in December 1988 for the misdemeanor of carrying a knife in his boot was surely insignificant in relation to the accompanying evidence that he had four prior narcotics convictions, including two for possession of amphetamine with intent to deliver. Also, the district judge promptly gave a curative instruction directing the jury not to consider the information in the prosecutor's question as evidence at all, and the prosecutor hastily retreated from his line of questioning. If anything, the prosecutor probably damaged his own standing with the jury through his ineffective attempt to catch Hammack in a lie.

Also, we note that Hammack's counsel must bear some of the blame for the issue coming before the jury at all. If he had fully apprised himself of the facts sur-

rounding the April 1990 conviction, he could have demonstrated to the judge during the bench conference that Hammack's testimony on direct examination had not in fact "opened the door" to evidence of the April 1990 conviction.

Under these circumstances, we find no merit in Hammack's contentions in this respect.

■■■ Both Carter and Hammack also argue that the admission of the misdemeanor weapon offense was independently erroneous because it was not punishable by imprisonment of more than one year, as required by Federal Rule of Evidence 609(a)(1), and because it would not have been admissible for any purpose under Rule 404(b).[2] However, the purpose for admission of the misdemeanor offense was not to attack Hammack's general credibility, as Rule 609 contemplates, but to contradict his specific testimony that he had been continuously employed from January to June of 1990. This is not the type of situation for which the safeguards of Rule 609 are intended; rather, under the general standards of Rules 402 and 403, the evidence should be admitted if it is relevant and if its probative value is not substantially outweighed by the danger of unfair prejudice. *Cf. United States v. Opager*, 589 F.2d 799, 802–03 (5th Cir.1979) (holding that Rule 608(b)'s prohibition of extrinsic evidence used to prove specific instances of misconduct did not apply when the evidence was offered to contradict a witness's testimony as to a material issue of the case).[3] Once defense counsel had made Hammack's activities prior to June 1990 a subject of the direct examination in order to add legitimacy to Hammack's version of the events at Carter's house, it was clearly within the district court's discretion to conclude that evidence altering that picture (as

this evidence appeared to, based on the information provided to the court) was relevant and admissible, even if not greatly significant.

■■■ Finally, Hammack argues that it was error to admit the 1987 felony convictions for possession of amphetamine with intent to deliver, because they have no bearing on knowledge or intent to commit the charged offense, which was conspiracy to *manufacture* amphetamine. Therefore, he argues, the evidence served only the impermissible purpose of demonstrating a propensity to commit drug crimes, *see* Fed. R.Evid. 404(b), or at any rate its scant probative value was substantially outweighed by its prejudicial effect, *see* Fed. R.Evid. 403.

We disagree. Hammack testified on direct examination that he detected an odd odor around Carter's house, but was not sure what it was, and believed that it might be attributable to a garbage dump behind the house. Therefore, his knowledge of the drug operations at Carter's house was in issue, and evidence that would tend to make less probable his claim that he did not recognize the smells associated with amphetamine manufacturing was relevant for a legitimate purpose. The evidence that he had used amphetamine in the past and had twice been convicted for possessing amphetamine served this purpose. Moreover, we do not believe that the probative value of this evidence—which tended to negate a central part of Hammack's defense—was substantially outweighed by its prejudicial effect.

### III. Jury Instruction Not to Consider the Presence of the Handgun

■■■ As noted, the district court granted Carter's motion for acquittal on Count

---

**2.** Carter argues that it was prejudicial to him because it made his co-defendant Hammack appear untruthful, and because it led the jury to view Carter as someone who consorted with a person who carried weapons.

**3.** The related principle that comes into play in this situation is the rule prohibiting impeachment on collateral matters. *See McCormick on Evidence* § 47, at 110 (E. Cleary 3d ed. 1984).

However, we believe that McCormick's guidance on this rule is sound and forecloses its availability to the defendants here: a matter should not be deemed collateral if it is a "contradiction of any part of the witness's account of the background and circumstances of a material transaction, which as a matter of human experience he would not have been mistaken about if his story were true." *Id.* at 112.

Three—charging use of a firearm in connection with a drug trafficking offense—prior to submitting the case to the jury. Accordingly, the court's charge included an instruction that the jury was to disregard the fact that they were not being called upon to decide Count Three, and that they were not to speculate about or discuss the fact that there had been a Count Three in the indictment. Carter argues that he was harmed by the evidence of the firearm having been introduced at trial, and that the court's instruction failed to alleviate the prejudicial effect of that evidence.

Carter has not established that the Count Three charge was brought in bad faith by the government or that admission of Officer Johnson's testimony about the handgun beneath the mattress was improper. Moreover, Carter's counsel assented to the court's proposed jury charge about Count Three and did not at any point object to its adequacy or request a different remedy. We cannot conceive of any theory under which Carter has shown reversible error.

IV. Enhancement of the Offense Level for Possession of a Firearm

■■■ Carter raises two challenges to his sentence. The first is that, having entered a judgment of acquittal on Count Three, the district court erred in increasing his offense level by two for possession of a firearm in relation to a drug trafficking offense. *See* U.S.S.G. § 2D1.1(b)(1).

In *United States v. Juarez–Ortega*, 866 F.2d 747 (5th Cir.1989) (per curiam), this Court held that acquittal by the jury on an offense charged in the indictment "does not necessarily preclude consideration of underlying facts of the offense at sentencing so long as those facts meet the reliability standard." *Id.* at 749. We find that case to be controlling, because Carter never even contested the reliability of the government's evidence regarding the handgun. Moreover, we note that the primary reason for the judgment of acquittal in this case is not even implicated in the two-level increase under the sentencing guidelines. The district court granted an acquittal on Count Three largely because of a discrep-

ancy between the proof at trial and the indictment, which alleged only that Carter had "carried" a firearm. However, the guidelines direct a two-level upward adjustment if the offender "possessed" a firearm, U.S.S.G. § 2D1.1(b)(1), and Application Note 3 to the section indicates that "[t]he adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." *See also United States v. McKeever*, 906 F.2d 129, 134 (5th Cir.1990), *cert. denied sub nom. Newman v. United States*, — U.S. —, 111 S.Ct. 790, 112 L.Ed.2d 852 (1991).

V. Upward Departure from the Guidelines

Carter's second challenge to his sentence is that the district court erred in departing upward from the guideline range. The presentence investigation report (PSI) for Carter calculated a total offense level of 30 and a criminal history category of IV, resulting in a guideline range of 135 to 168 months. At the sentencing hearing, the district court stated that in its opinion a criminal history category of VI would more adequately reflect the seriousness of defendant's past criminal conduct. *See* U.S.S.G. § 4A1.3. Specifically, the court noted that the three-year term or terms to which Carter had been sentenced in state court in October 1989 actually represented concurrent sentences for five convictions of possession of controlled substances, arising from several independent occasions; had each of these offenses been counted separately, Carter's criminal history category would probably have been VI. Carter had been released on April 18, 1990 on a writ of habeas corpus pending his application for parole, and had committed the present offense while free pursuant to this writ. The district court further observed that this followed a pattern Carter had established in his earlier convictions of committing offenses while free on bond, which indicated a likelihood that he would commit future crimes. *See id.*

For these reasons, the court felt that an upward departure was warranted, and it

looked for guidance to the guideline range for criminal history category VI, which was 168 to 210 months. The court imposed a sentence roughly in the middle of that range—190 months. Carter submits on appeal that the district court's action was an abuse of discretion, because in drafting the guidelines the Sentencing Commission surely contemplated that the previous sentences used to compute the criminal history score might represent concurrent sentences for separate crimes.

■■■■■ This Court reviews a district court's upward departure from a sentencing guideline range to determine if the district court has articulated reasons for the departure that are acceptable (*i.e.*, not contrary to the guidelines) and reasonable. *United States v. Huddleston*, 929 F.2d 1030, 1031 (5th Cir.1991). Here, the court carefully and clearly set out its reasons for departing, and the extent of departure is consistent with those reasons. Moreover, contrary to Carter's argument, the primary reason given by the district court is consistent with the approach of the guidelines, which expressly sanction departure for "prior sentence(s) of substantially more than one year imposed as a result of independent crimes committed on different occasions." U.S.S.G. § 4A1.3(b). Therefore, we find no grounds for reversing the district court's sentence.

## VI. Improper Statements During Closing Argument

Hammack contends that the government's closing argument amounted to prosecutorial misconduct in two respects: (1) the prosecutor impermissibly sought to bolster government witnesses, and (2) the prosecutor sought to inflame the jurors' passions with an improper appeal to community sentiment.

The former allegation is based on numerous references during the closing argument to the police officers and DEA agents as "brave people," "people who risked their lives ... for the citizens of the Northern District of Texas," and the like. Hammack did not object to any of these references at trial. Accordingly, we will reverse only if

the comments rise to the level of plain error, *i.e.*, if the error is "obvious, substantial, and so basic and prejudicial that the trial lacks the fundamental elements of justice." *United States v. Simpson*, 901 F.2d 1223, 1227 (5th Cir.1990).

■■■■ Although we agree that much of the rhetoric of the prosecutor was not likely to advance the goal of making the trial "a neutral arena for the presentation of evidence upon which alone the jury must base its determination of a defendant's innocence or guilt," *United States v. Garza*, 608 F.2d 659, 662 (5th Cir.1979), we cannot say in light of the evidence in this case and the particular remarks made that the comments denied Hammack his basic right to a fair trial. The abuse to be guarded against is a prosecutor invoking considerations that are outside of the record evidence and would not have been deemed admissible evidence at trial. Thus, we have condemned suggestions that evidence not presented at trial would compel a finding of guilty, *see, e.g., United States v. Morris*, 568 F.2d 396, 401 (5th Cir.1978); *Hall v. United States*, 419 F.2d 582, 585 (5th Cir. 1969), and efforts to create the impression that the government, which possesses a "vast investigatory network" and whose determinations may both have a stamp of credibility and invoke jurors' loyalty, has already made an extrajudicial determination of guilt, *see, e.g., United States v. Goff*, 847 F.2d 149, 163-64 (5th Cir.), *cert. denied sub nom. Kuntze v. United States*, 488 U.S. 932, 109 S.Ct. 324, 102 L.Ed.2d 341 (1988); *Hall*, 419 F.2d at 583-84.

■■■■ Prosecutors' attempts to vouch for their witness's credibility implicate this concern in both ways: they imply that the prosecutor has additional personal knowledge about the witness and facts that confirm the witness's testimony, and they add to the witness's testimony the influence of the prosecutor's official position. *Morris*, 568 F.2d at 396; *United States v. Ellis*, 547 F.2d 863, 869 (5th Cir.1977). Therefore, we have on occasion found such comments sufficient to rise to the level of plain error. In *Garza*, for instance, the prosecutor's closing argument vouched for the integrity and

ability of a DEA agent and a confidential informant, and suggested that the fact that those people believed the defendant to be guilty confirmed his guilt. He told the jury that they could infer that the DEA agent was good at his job from the fact that he had gotten a promotion from the San Antonio Police Department to the DEA. *Garza,* 608 F.2d at 661. Numerous further comments in the same vein followed. This Court held that while any single statement in the argument might not have supported reversal, the cumulative effect was to prejudice the substantial rights of the defendant. *Id.* at 665–66; *see also United States v. Corona,* 551 F.2d 1386, 1388–91 (5th Cir.1977) (finding that prosecutor's closing argument, in which he not only personally vouched for a witness but also made various references to facts outside the record, constituted plain error).

Judged according to the principles discussed above, however, the prosecutor's statements in this case are not nearly so egregious and fall short of plain error. The prosecutor's praise of the officers' bravery was expressly based on the evidence that the jurors had already heard; he did not imply that he had independent knowledge of their bravery, much less their truthfulness. *See United States v. Davis,* 831 F.2d 63, 67 (5th Cir.1987) (holding that where the prosecutor did not offer his independent determination of a witness's credibility, his statement that police officers "don't go out and risk their lives so they can come in here and tell you a bunch of lies" was not plain error); *United States v. Nanez,* 694 F.2d 405, 410 (5th Cir.1982) (holding that in order for bolstering to constitute plain error, the prosecutor must have "intertwined his own personal and official credibility with that of the witnesses"), *cert. denied,* 461 U.S. 909, 103 S.Ct. 1884, 76 L.Ed.2d 813 (1983). Moreover, in contrast to *Garza,* the comments here are much less extensive.

▮ Hammack's second challenge to the closing argument—that it contained an improperly inflammatory call for general law enforcement—is also unavailing. It is premised on certain remarks of the prosecutor to the effect that the jurors would have to go back to their communities after the trial and face their wives and children, and that the police officers had "done their jobs ... Now you have to do your job." Additionally, the prosecutor said:

"Members of the jury, people, you hear it every day, they are always saying, what are we going to do about the drug problem? What are 'they' going to do about the drug problem?

Members of the jury, the 'they' are you. What are you going to do about it? You can be the weakest link in this chain or you can become the strongest link in this chain."

Again, no objection to these comments was lodged at trial, so they provide grounds for reversal only if they were plain error. Immediately following the last quoted remarks, the prosecutor did ask that the jury "let the evidence guide you" and "bring back a just verdict based upon the evidence that you have heard." Although again we would not recommend this part of the closing argument as a model for prosecutors, we view the challenged comments as we have two similar calls for the jury to take a stand against pervasive crime: if it did go "beyond the proper limits of a plea for law enforcement or an appeal to the jury to act as the conscience of the community, it did not do so egregiously." *United States v. Castro,* 874 F.2d 230, 233 (5th Cir.), *cert. denied,* 493 U.S. 845, 110 S.Ct. 138, 107 L.Ed.2d 97 (1989); *United States v. Canales,* 744 F.2d 413, 430 (5th Cir.1984). Accordingly, Hammack cannot meet the onerous standard of plain-error review.

## VII. Violation of Due Process in Referral of the Case for Federal Prosecution

▮ Carter and Hammack were arrested by a DEA Task Force composed of local law enforcement officers, members of the Fort Worth Police Department and Cross Timbers Police Department. The arresting officers apparently had discretion as to whether Carter and Hammack's case would be referred for prosecution to the state district attorney's office or to the United States Attorney's office. Hammack argues that the decision to refer the case

for federal prosecution violated his due process rights because it exposed him to substantially more severe sentences and was made without any objective or reviewable guidelines or standards. His argument is based entirely on *United States v. Williams*, 746 F.Supp. 1076 (D.Utah 1990).

Although there are a number of grounds on which the soundness of this legal theory might be reasonably questioned, the most prominent is that even after a case is referred for federal prosecution, the ultimate decision of whether or not to charge a defendant presumably rests with the federal prosecutor (and, for felonies, as here, also requires grand jury indictment). We have certainly been shown no evidence to the contrary in this case. It has long been the rule that, so long as he has probable cause to believe that the accused has committed an offense, the prosecutor has complete discretion in deciding whether or not to prosecute or what charge to file. *Bordenkircher v. Hayes*, 434 U.S. 357, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978). Moreover, this discretion by the federal prosecutor would exist even if the Task Force referred the case for state prosecution; a defendant may be prosecuted and convicted under a federal statute even after having been convicted in a state prosecution based on the same conduct. *Abbate v. United States*, 359 U.S. 187, 79 S.Ct. 666, 668–71, 3 L.Ed.2d 729 (1959). (Indeed, the *Abbate* Court noted that this firmly established principle is required *because* of disparities between federal and state sentencing schemes. *Id.* 79 S.Ct. at 671.) In our view, these considerations are fatal to Hammack's claim. The Tenth Circuit has adopted this position and thereby eviscerated *Williams*. *United States v. Andersen*, 940 F.2d 593, 595–97 (10th Cir.1991).

## VIII. *Doyle* Violations

In *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the Supreme Court clarified that the Due Process Clause embraces the right not to have one's post-arrest, post-*Miranda*-warning silence used for impeachment at trial. The following

year, in *Chapman v. United States*, 547 F.2d 1240 (5th Cir.), *cert. denied*, 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1977), this Circuit reexamined its existing precedent on post-*Miranda* silence in light of *Doyle*. In doing so, we found it necessary to address an issue expressly reserved by the Supreme Court in *Doyle:* whether the doctrine of harmless constitutional error[4] applied to *Doyle* violations. *Id.* at 1247–48; *Doyle*, 96 S.Ct. at 2245. Our holding that the doctrine did apply led us to categorize our prior cases according to the following principles:

"When the prosecution uses defendant's post-arrest silence to impeach an exculpatory story offered by defendant at trial and the prosecution directly links the implausibility of the exculpatory story to the defendant's ostensibly inconsistent act of remaining silent, reversible error results even if the story is transparently frivolous. [citing *United States v. Luna*, 539 F.2d 417 (5th Cir.1976) (per curiam); *United States v. Harp*, 536 F.2d 601 (1976) (per curiam) ]

When the prosecutor does not directly tie the fact of defendant's silence to his exculpatory story, *i.e.*, when the prosecutor elicits that fact on direct examination and refrains from commenting on it or adverting to it again, and the jury is never told that such silence can be used for impeachment purposes, reversible error results if the exculpatory story is not totally implausible or the indicia of guilt not overwhelming. [citing *United States v. Impson*, 531 F.2d 274 (5th Cir.1976) ]" *Chapman*, 547 F.2d at 1249.

Hammack refers us to three instances during his trial that he claims constitute *Doyle* violations:

(1) During the government's case-in-chief, when the prosecutor was conducting his direct examination of Officer Campbell, the following exchange (Comment 1) took place:

"Q: Now, can you tell the jury whether or not this person [Hammack] made any unsolicited statements to you at this time or at any time?

---

4. *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967).

A: I identified myself again as a police officer and advised him of.his rights, not knowing who I had in custody, believing it possibly was Joseph Carter.

Q: Okay.

A: He then would not make any statements."

Hammack made no objection to any of this.

(2) Later, during cross-examination of Hammack, the following exchange (Comment 2) took place:

"Q: And you never told the police that Mahaffey had brought any chemicals there; is that right?

A: No sir, I did not. I didn't know Mahaffey had brought any chemicals there.

Q: But you just told this jury that you felt as though he had brought some chemicals there?

A: That is right. I felt it. I didn't know it.

Q: And you went to jail on July the 11th of 1990; is that correct?

A: That is correct.

Q: And you have been in jail up until today; is that correct?

A: That is correct.

Q: And you never told anybody this, any law enforcement officials; is that right?"

At this point, Hammack's counsel made his only objection, and the court instructed the jury that they should not consider any implication that the prosecutor was trying to make about Hammack's post-arrest behavior for any purpose. The prosecutor then moved on to other subjects.

(3) During closing argument, the prosecutor asked the jury rhetorically: "Would you remain silent when you were being arrested and taken away?" (Comment 3) No objection was made.

In evaluating these three comments under the framework established by our *Chapman* decision, we must also consider the effect of a failure to object. We have held that in such situations the comment must meet the plain-error standard, *i.e.*, the error must be " 'so great as to result in the likelihood of a grave miscarriage of justice.' " *United States v. Cardenas Alvarado*, 806 F.2d 566, 573 (5th Cir.1986) (quoting *United States v. Franklin*, 586 F.2d 560, 569 (5th Cir.1978), *cert. denied sub nom. Bonamo v. United States*, 440 U.S. 972, 99 S.Ct. 1536, 59 L.Ed.2d 789 (1979)); *accord United States v. Morales*, 854 F.2d 61, 63 (5th Cir.1988), *cert. denied*, 488 U.S. 1011, 109 S.Ct. 798, 102 L.Ed.2d 789 (1989).

 Comment 1 was couched in the arresting officer's narrative of the events surrounding arrest. Although it was prompted, if not specifically elicited, by a question from the prosecutor,[5] the prosecutor did not focus or follow up on the response. Indeed, since Hammack had not at that point of the trial offered any exculpatory story, the evidence could have had only a minor effect as slight substantive evidence[6] or remote impeachment-in-advance. In *Chapman* itself we held such a question and answer to be in violation of *Doyle* but harmless, because the defendant's story was transparently frivolous and the evidence of guilt was overwhelming. *Chapman*, 547 F.2d at 1250. We hold that the potential for prejudice to

---

**5.** Officer Campbell's answer went somewhat beyond the question, because the prosecutor did not ask whether or not Hammack had refused to answer questions put to him at the scene of the arrest. However, the issue of whether *Doyle* was violated by the prosecutor's question or by Campbell's answer is not critical. Although in several cases we have relied in part on the fact that a *Doyle* violation was committed spontaneously by a witness rather than by the prosecution in finding that the error was harmless, *see, e.g., United States v. Shaw*, 701 F.2d 367, 381 n. 8 (5th Cir.1983), *cert. denied*, 465 U.S. 1067, 104 S.Ct. 1419, 79 L.Ed.2d 744 (1984); *United States v. Smith*, 635 F.2d 411, 413 (5th Cir. Unit B

1981) (per curiam); *United States v. Sklaroff*, 552 F.2d 1156, 1162 (5th Cir.1977), *cert. denied*, 434 U.S. 1009, 98 S.Ct. 718, 54 L.Ed.2d 751 (1978), this question is not necessarily dispositive of the due process issue. *United States v. Espinosa–Cerpa*, 630 F.2d 328, 335 (5th Cir. 1980). The more important focus is the likely effect on the jury given the context of the remarks. *Cardenas Alvarado*, 806 F.2d at 572; *Shaw*, 701 F.2d at 381 & n. 8.

**6.** Use of post-arrest silence for its substantive value is likewise prohibited. *United States v. Shavers*, 615 F.2d 266, 269 (5th Cir.1980).

Hammack from Comment 1 was not so great as to meet the plain error standard.

■ Comment 2 presents somewhat different considerations. A prosecutor's or witness's remarks constitute comment on a defendant's silence if the manifest intent was to comment on the defendant's silence, or if the character of the remark was such that the jury would naturally and necessarily so construe the remark. *United States v. Shaw*, 701 F.2d 367, 381 (5th Cir.1983), *cert. denied*, 465 U.S. 1067, 104 S.Ct. 1419, 79 L.Ed.2d 744 (1984). Unlike Comment 1, the purpose behind the questions of Comment 2 is apparent: the prosecutor clearly hoped that Hammack's silence prior to trial would raise the inference that his suggestion that a third party named Keith Mahaffey had brought the drug equipment to the house was a recent fabrication. Comment 2 thus meets this Circuit's test for a comment on the defendant's silence, and was directly linked to the plausibility of the defendant's testimony. Nevertheless, three considerations weigh against strict application of the *Chapman* rule (that reversal is mandated even if the exculpatory story is transparently frivolous).

■ The first is that while the purpose of. Comment 2 was clearly the one condemned by *Doyle*, it is not so clear that the "silence" at issue was that protected by *Doyle*. The specific outcome of *Doyle*—that evidence of a defendant's post-arrest silence was inadmissible as impeachment of a defendant's exculpatory story—had been reached the previous year on nonconstitutional grounds in *United States v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975). The *Hale* Court observed that silence following arrest is inherently ambiguous, and combines weak probative value with significant potential for prejudice. *Hale*, 95 S.Ct. at 2136–38. It then held, in its exercise of supervisory authority over the federal courts, that "under the circumstances of this case," it was error for the trial court to have allowed cross-examination of the defendant concerning his silence. *Id.* at 2138–39. The *Doyle* Court elevated this specific holding to a constitutional principle by adding the observation

that it was "fundamentally unfair and a deprivation of due process" to use a defendant's silence against him after the government has, through the *Miranda* warnings, implicitly assured him that silence will carry no penalty. *Doyle*, 96 S.Ct. at 2245. The question following *Doyle* was whether the due process interest—which this Circuit set out standards for vindicating in *Chapman*—existed only in the narrow contexts in which governmental action had created reliance by the defendant, or whether it extended to the other situations in which the rationale of *Hale* would logically apply. *See Hale*, 95 S.Ct. at 2137 (noting that a variety of factors other than *Miranda* warnings may influence a defendant's decision to remain silent).

Subsequent Supreme Court decisions have clarified that the *Doyle* protection derives primarily from the implicit assurance of the *Miranda* warnings and thus is strongest in the context of immediate post-*Miranda*-warning interrogation. In *Jenkins v. Anderson*, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), the Court held that due process was not offended by the use of a defendant's pre-arrest silence to impeach his credibility because "no governmental action induced petitioner to remain silent before arrest." *Id.* 100 S.Ct. at 2130; *see also Anderson v. Charles*, 447 U.S. 404, 100 S.Ct. 2180, 2182 & n. 2, 65 L.Ed.2d 222 (1980) (per curiam). Even more tellingly, in *Fletcher v. Weir*, 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982) (per curiam), the Court confronted a defendant whose post-arrest silence had been used to impeach his exculpatory story at trial, but who had not been given *Miranda* warnings during the period he remained silent immediately after his arrest. The Court held that in the absence of the type of assurances contained in the *Miranda* warnings, the degree of protection to be afforded a defendant against impeachment based on post-arrest silence could be resolved under state rules of evidence. *Id.* 102 S.Ct. at 1312. Finally, in *Wainwright v. Greenfield*, 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986), the Court held that using post-*Miranda*-warning silence as evidence of sanity violated due process. *Id.*

106 S.Ct. at 641. The Court rebutted the contention that silence was far more probative of sanity than of commission of the underlying offense by noting that *Doyle* rests on the "implied assurance" rationale, and the ambiguity rationale of *Hale* "merely added weight." *Id.* at 640.

Although none of these post-*Doyle* decisions controls the present case, as a group they do indicate that the silence targeted by the prosecutor in Comment 2 is not the core *Doyle* concern. The prosecutor was primarily commenting not on Hammack's refusal to submit to interrogation by the arresting officers in the early morning hours of July 11, 1990, but on the improbability that Hammack would languish for two and a half months in jail in possession of information that might, upon investigation, have resulted in his release. As in *Hale,* there is reason to treat that evidence with caution or disapproval: one can imagine legitimate motives for that decision, which was essentially a strategic component of his defense and presumably was based on the advice of his attorney. However, reliance on the *Miranda* warnings given on July 11th is not among those plausible motives. For that reason, we question whether the strict due process safeguards of *Chapman,* derived solely from *Doyle,* represent the proper approach to assessing the harmfulness of Comment 2.

The second consideration weighing against application of the stringent *Chapman* standard is that the story being impeached here is essentially peripheral to Hammack's defense. We have held the first *Chapman* category is implicated only when the *Doyle* error "go[es] to the heart of the defense." *Passman v. Blackburn,* 797 F.2d 1335, 1348 (5th Cir.1986), *cert. denied,* 480 U.S. 948, 107 S.Ct. 1609, 94 L.Ed.2d 794 (1987). In *Passman* we decided that the substance of a defendant's trial testimony, which the prosecutor improperly pointed out had never been raised prior to trial, was not a truly exculpatory story because the jury could credit the story and still convict the defendant of the charged crime. The same is true here. A jury could believe that Mahaffey was involved in the conspiracy or was even its ringleader but still conclude that the circumstantial evidence and police officers' testimony established that Hammack was a knowing participant in whatever conspiracy existed. More concretely, Hammack's biggest obstacles in trying to convince the jury of his innocence were (1) persuading them of the falsity of Officer Campbell's testimony that Hammack emerged from the shed and tried to flee, and (2) persuading them that the substantial circumstantial evidence against him—temporary residence at the house, friendship with Carter, etc.—did not preclude the possibility that he was an unknowing and uninvolved guest. The jury's conclusions about Mahaffey's role had no bearing one way or another on the crucial credibility choices, and only remote bearing on the latter issue.

Following *Passman,* then, this case would not fit the first *Chapman* category even with a core *Doyle* violation. *Passman,* like most cases, could not be resolved solely by reference to the *Chapman* categories; in such instances, the courts of this Circuit apply a case-by-case approach using the *Chapman* categories as guidelines for assessing the prejudice to the defendant in the particular context, including the strength of the evidence. *Cardenas Alvarado,* 806 F.2d at 572; *Shaw,* 701 F.2d at 382–83; *Alderman v. Austin,* 695 F.2d 124, 126 & n. 7 (5th Cir.1983) (en banc).

A third consideration weighing against the rule set forth in *Chapman* (and playing a role in the case-specific assessment of prejudice) is the presence of a factor not dealt with in *Chapman:* here the defendant objected to the prosecutor's question and received all of the relief he requested. Hammack never either suggested to the district judge that the instruction he gave was inadequate, or requested a mistrial. We stressed the importance of this consideration in a more general context in *United States v. Canales,* 744 F.2d 413 (5th Cir. 1984), noting that "[w]hen we are asked to reverse in these circumstances we are, in effect, asked to go against the implicit judgment of both the trial court and the defendant's trial counsel that the trial

court's corrective action was adequate and appropriate." *Id.* at 431. Moreover, absent a most egregious wrong by the prosecutor, defense counsel should normally not be allowed to gamble on the verdict. *Id.* Because logically there is little difference between a case that comes to us where no objection has been made to the alleged impropriety and one where no further objection has been made to the trial judge's handling of an impropriety, we concluded in *Canales* that the plain-error standard of review should apply. *Id.*

In some prior cases this Court has treated *Doyle* violations in a manner significantly different from that which the *Canales* approach would suggest, either in reversing cases where no objection was made, *see, e.g., United States v. Henderson,* 565 F.2d 900 (5th Cir.1978); *Harp,* 536 F.2d at 602, or in reversing cases where a curative instruction was given and the opinion does not reflect whether a mistrial was requested, *see, e.g., United States v. Edwards,* 576 F.2d 1152, 1155 (5th Cir.1978) (per curiam) (finding that the error could not be classified as harmless and noting that "[t]he circumstances under which [a comment on the silence of the accused] will not occasion a reversal are few and discrete").[7]

However, for the reasons set forth above, we do not believe that those decisions preclude our embrace of the *Canales* approach in the case before us. We are not dealing with a classic *Doyle* violation focusing on immediate post-arrest conduct. The Fifth Circuit cases following in the wake of *Chapman* must be viewed through the lens of subsequent Supreme Court pronouncements narrowing *Doyle* (and thus *Chapman* as well). *See Jenkins, supra; Fletcher, supra.* One such pro-

nouncement is *Greer v. Miller,* 483 U.S. 756, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987), in which the Court held that an objection which was interposed before an improper question about post-arrest silence could be answered, and which was followed by an instruction to the jury to ignore the question, sufficed to prevent a *Doyle* violation from even occurring. *Id.* at 3108. *Greer* does not directly address the present case; here the prosecutor's question was initially answered, and the *Greer* Court did not speak to when a *Doyle* violation is harmless or falls short of plain error. Nevertheless, *Greer* is informative on some matters of importance to this case. It did consider curative instructions at least effective to prevent the prosecutorial misconduct of putting defendant's post-arrest silence before the jury from rendering the trial fundamentally unfair. *Id.* at 3109. Also, in confronting the defendant's belated contention that the jury instructions should have been more specific, the Court indicated that it is the duty of counsel to determine what strategy is in his client's best interest in remedying an impermissible comment on post-arrest silence. *Id.* at 3109 n. 8.

For these reasons, we assess Comment 2 under the plain-error standard. Viewing the comment in the overall context of the case, we are unable to conclude that it likely played any significant role in the jury's determination. It related to a peripheral aspect of Hammack's defense, and the jury was instructed to disregard it.[8] Therefore, we hold that Comment 2 did not result in any likelihood of a grave miscarriage of justice.

Finally, Comment 3—the rhetorical question during closing argument—was not objected to and therefore must also be

---

7. *Edwards* does not purport to address the failure (if there were such) to move for a mistrial or other relief beyond that given by the trial court.

To the extent that dicta in some of these opinions might be read to state that a jury instruction *cannot* cure a *Doyle* violation, *see Henderson,* 565 F.2d at 904; *United States v. Johnson,* 558 F.2d 1225, 1230 (5th Cir.1977), we reject that suggestion as contrary to the case-by-case approach required when no *Chapman* category squarely applies, *see Shaw, supra,* and indeed contrary to the case-by-case nature of

harmless-error analysis, which is dictated by *Chapman* itself. *See Cardenas Alvarado,* 806 F.2d at 575; *United States v. Dixon,* 593 F.2d 626, 629 (5th Cir.), *cert. denied,* 444 U.S. 861, 100 S.Ct. 126, 62 L.Ed.2d 82 (1979).

8. Where the improper evidence provides only "inferential incrimination," it is normally presumed that the jury will follow an instruction to disregard it. *Greer,* 107 S.Ct. at 3109 n. 8; *Richardson v. Marsh,* 481 U.S. 200, 107 S.Ct. 1702, 1708, 95 L.Ed.2d 176 (1987).

judged by the plain-error test. Although this comment pertained to Hammack's immediate post-arrest silence and related to the essence of his defense (lack of knowledge and noninvolvement), the prosecutor mentioned it only once very briefly in passing (in the middle of his final argument, which covers some five pages in the transcript) and never emphasized it. (By comparison, in *Cardenas Alvarado* we found a far more extensive *Doyle* violation in a closing argument to be harmless error and *a fortiori* not plain error. *Cardenas Alvarado*, 806 F.2d at 574 n. 4.) We again find no basis for concluding that there is any likelihood of a grave miscarriage of justice having resulted from this comment.

Finally, we are unable to conclude that the cumulative effect of the three comments (or any of the other matters complained of) was such as to have denied Hammack a fair trial or have likely resulted in a miscarriage of justice, particularly in light of the very strong evidence of his guilt.

### Conclusion

Because we find all of Carter's and Hammack's contentions ultimately unavailing to establish reversible error, the convictions and sentences imposed by the district court are

AFFIRMED.