IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 99-31243
_____

MILTON WILLIAMS,

Petitioner-Appellant,

v.

BURL CAIN, Warden, Louisiana State Penitentiary,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
99-CV-676-J
_____
September 8, 2000

Before REAVLEY, BENAVIDES, and DENNIS, Circuit Judges.

PER CURIAM:[*]

Appellant Milton Williams ("Williams") appeals from the district court's dismissal with prejudice of his habeas petition. Because we find no merit to Williams's <u>Doyle</u> or <u>Brady</u> claims, nor to his assertion that the state tried him while shackled and wearing prison garb, we affirm.

## I.    **Factual and Procedural Background**

On the afternoon of October 21, 1993, Williams left his

_____

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

house to attend to a plumbing job. When he left, his wife, Karen, and his son, Milton, Jr., were both at home, as was a man doing tile work in the upstairs bathroom. He returned home that night, whereupon he became embroiled in an argument with Karen. Williams accused Karen of flirting with the tile layer, and she protested her innocence. Their altercation carried them upstairs to their bedroom, where Williams's .357 Smith & Wesson sat on the night stand, placed there earlier in the day by Milton, Jr., who had found the gun lying on the family entertainment center uncocked. From his vantage point on the couch in the den next to his parents' bedroom, Milton, Jr. saw his mother, but not his father, during the fight. Milton, Jr. heard Williams tell Karen to leave him alone "before I have to hurt you." About five minutes later, after Karen refused to desist her protestations, Williams shot Karen in the face, near her right eye.

Milton, Jr. watched his mother fall to the floor. He raced to the bedroom, where he found Williams crying and the gun on the floor. Williams told Milton, Jr. that he had not intended to shoot Karen; he complained that the gun had been in his hand and just went off. Milton, Jr. picked up the phone and dialed 911; Williams spoke to the operator and begged her not to let his wife die.

Officers Euclid Talley ("Talley") and Lawrence Zapata ("Zapata") responded to Williams's 911 call. After a preliminary investigation revealed that Karen was still breathing, Officer

2

Talley handcuffed Williams and informed him that he was under arrest for aggravated battery. Officer Talley advised Williams of his Miranda rights and then asked him what had happened. Williams related that he had accidentally shot his wife. He claimed that he and Karen were not arguing, that they had been getting ready for bed when he placed the gun on the night stand, and it accidentally discharged.

Officer Talley then left to attend to Karen, while Officer Zapata guarded Williams, who wanted to go upstairs to see Karen and was becoming agitated. Officer Zapata chided Williams to calm down, reminded him that he was under arrest for aggravated battery, and read him his Miranda rights again. Saying that he understood his rights, Williams confessed to Officer Zapata that he and Karen had been arguing. Williams admitted that he wanted to scare his wife, so he picked up the gun and slammed it down on a piece of furniture, at which point it fired accidentally.

Officers Donald Clogher ("Clogher") and Meunier ("Meunier") arrived after Officers Talley and Zapata. Officer Clogher interviewed Williams to prepare the incident report. Williams had already received Miranda warnings. When Officer Clogher inquired about Williams's name, address, date of birth, and other vital statistics, Williams told him that he and Karen had been preparing for bed when the gun fell from the night stand onto the floor and discharged.

When Karen's death appeared inevitable, New Orleans Homicide

3

Detective Anthony Small ("Small") arrived at Williams's residence to direct the investigation and transport Williams to the homicide office. Detective Small alerted Williams that he was under arrest for Karen's murder and read him his <u>Miranda</u> rights. At this point, Williams chose not to waive his rights and remained silent.

At the trial, Officer Kenneth Leary ("Officer Leary") testified that Williams's .357 Smith & Wesson had an internal block covering the firing pin which could only be released by pulling the trigger. Officer Leary therefore concluded that, had the gun fallen or been dropped, it would not have discharged. Officer Leary also stated that, based on the stippling around the gun-shot wound, the gun was between 3 and 3½ feet from Karen when Williams fired it. Finally, Officer Leary affirmed that the gun, when cocked, had a 5 lb. trigger pull, but the uncocked gun had a trigger pull of 11½ lbs.

In addition to Officer Leary's testimony, Sheila Craig, Karen's sister, Kimberly Johnson, Karen's daughter and Williams's step-daughter, Cinnamon Billy Smith, an employee at the Metropolitan Battered Women's Program, and Linda Brion, Karen's friend, all testified that Williams had a prolonged history of physically abusing Karen, including two incidents when Williams hit Karen with a baseball bat, two occasions when he beat her while she was pregnant, and numerous accounts of bruises, black eyes, swollen lips, and threats against Karen's life.

4

The jury found Williams guilty of second degree murder, and the judge sentenced Williams to life in prison. After the rejection of his direct appeals and state petitions for post-conviction relief, Williams filed a federal habeas petition in March, 1999. The magistrate issued a Report and Recommendation, advising dismissal with prejudice of the petition, and the district court adopted the Report and Recommendation, entering judgment against Williams on October 26, 1999.

Williams requested a certificate of appealability, which the district court granted as to issues 5 (<u>Doyle</u> claim), 7 (<u>Brady</u> violation), and 9 (shackles and prison garb).

## II.   *Doyle* Claim

Williams claims that the following exchange during the prosecution's direct examination of Detective Small constitutes a <u>Doyle</u> violation that necessitates reversal of his conviction:

> Q.   Did you take custody of the defendant Milton Williams?
> A.   Yes, upon leaving the scene.
> Q.   And you ordered him placed under arrest?
> A.   Yes.
> Q.   Did he make any statement to you?
> A.   No, sir, he didn't make any statements to me.
> Q.   Did he refuse to make a statement and waive his rights?
> A.   Yes, upon arriving at the homicide office he was formally advised of his charges and constitutional rights as per the <u>Miranda</u> warning. Mr. Williams refused to waive his rights and give a statement.

Williams's counsel objected at this point in the questioning and moved for a mistrial. The district court denied Williams's motion and refused to give a limiting instruction to the jury.

5

Pursuant to Doyle v. Ohio, 426 U.S. 610 (1976), "the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving Miranda warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." Id. at 619 (footnote omitted). This rule finds its rationale in the fact that "every post-arrest silence is insolubly ambiguous because of [the Miranda warnings.]" Id. at 617 (footnote omitted). Because the Miranda warnings implicitly assure an arrestee that he will not be penalized for his silence, "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." Id. at 618 (footnote omitted).

Although "virtually any description of a defendant's silence following arrest and a Miranda warning will constitute a Doyle violation," United States v. Shaw, 701 F.2d 367, 382 (5th Cir. 1983), Doyle violations are susceptible to harmless error analysis. See Chapman v. State of California, 386 U.S. 18, 22-24 (1967). "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." Id. at 24. To ascertain whether a Doyle error is harmless beyond a reasonable doubt, a reviewing court must inquire whether the error "'had a substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 638 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 766 (1946)).

6

In this Circuit, we have long used the three categories set forth in Chapman v. United States, 547 F.2d 1240 (5th Cir. 1977), to guide our harmless-beyond-a-reasonable-doubt determination:

> [First,] [w]hen the prosecution uses defendant's post-arrest silence to impeach an exculpatory story offered by defendant at trial and the prosecution directly links the implausibility of the exculpatory story to the defendant's ostensibly inconsistent act of remaining silent, reversible error results even if the story is transparently frivolous.
> [Second,] [w]hen the prosecutor does not directly tie the fact of the defendant's silence to his exculpatory story, i.e., when the prosecutor elicits that fact on direct examination and refrains from commenting on it or adverting to it again, and the jury is never told that such silence can be used for impeachment purposes, reversible error results if the exculpatory story is not totally implausible or the indicia of guilt not overwhelming.
> [Third,] [w]hen there is but a single reference at trial to the fact of defendant's silence, the reference is neither repeated nor linked with defendant's exculpatory story, and the exculpatory story is transparently frivolous and evidence of guilt is otherwise overwhelming, the reference to the defendant's silence constitutes harmless error.

Id. at 1249-50 (citations and footnote omitted).

The context of the comment on the defendant's silence also influences our determination of error. Where the reference occurs before the defendant has offered an exculpatory story, "the evidence [can] have . . . only a minor effect as slight substantive evidence or remote impeachment-in-advance." United States v. Carter, 953 F.2d 1449, 1463 (5th Cir. 1992).

Applying these strictures, we hold that Detective Small's response to the prosecution's questions about whether Williams made a statement did violate Williams's due process rights under

7

Doyle, but that the error was harmless beyond a reasonable doubt. The prosecution made only a single reference to Williams's silence, which reference occurred on the direct examination of Detective Small, and the prosecutor failed to link the silence to Williams's exculpatory story, which was yet to be offered. As such, the Doyle violation falls beyond the purview of the first Chapman category. Whether it falls within the scope of the second or third Chapman categories depends on whether the exculpatory story is "totally implausible" or whether the indicia of guilt is "overwhelming."

Williams had long caused serious bodily injury to Karen. He had repeatedly made threats on her life. Just before he shot Karen, Milton, Jr. heard Williams tell Karen that he would "have to hurt [her]" if she did not stop talking. Williams shot Karen in the face while standing approximately 3 to 3½ feet away from her, using a gun that had been uncocked earlier in the day when Milton, Jr. placed it on the night stand, and which would not have discharged accidentally when dropped because it had an internal block covering the firing pin. Williams's .357 Smith & Wesson had a 5 lb. trigger pull when cocked, and an 11½ lb. trigger pull when uncocked. In other words, to have shot Karen, Williams either had to cock the gun and pull the trigger, or pull the trigger with considerable effort. After he shot Karen, Williams told four different versions of the event to the police and Milton, Jr., all of which involved the gun firing without him

8

having pulled the trigger.

In these circumstances, Williams's multiple versions of the shooting are transparently frivolous. Though he consistently maintained that the shooting was an accident, he never consistently accounted for how it could have mistakenly happened. All of his versions of the story require the gun to fire without his having pulled the trigger, an event that could not have occurred absent a malfunction of the gun's internal block, a scenario for which Williams offered no proof.

Moreover, the evidence at trial presented overwhelming indicia of Williams's guilt. Second degree murder under Louisiana law requires the specific intent to kill or inflict great bodily harm. La. Rev. Stat. Ann. § 14:30.1(A)(1). Williams had in the past beaten Karen with a baseball bat and inflicted injuries while she was pregnant. He threatened to kill her many times. Just before he shot her, he told her he would "have to hurt [her]." He stood within 3 to 3½ feet of her, pointing a gun at her face, and he pulled the trigger. This evidence constitutes overwhelming indicia of his intent to inflict serious bodily injury.

However, even were Williams's exculpatory story not transparently frivolous or were the indicia of Williams's guilt not overwhelming, the Doyle violation would still be harmless. After the shooting, Officers Talley and Zapata and Detective Small all administered Miranda warnings. Williams nevertheless

9

spoke freely to Officers Talley, Zapata, and Clogher. Although Williams did refuse to waive his rights and make a statement to Detective Small, the prosecution could hardly argue successfully that Williams's silence with Detective Small somehow contradicts his exculpatory story at trial, for the simple reason that Williams asserted his exculpatory story—namely, that the shooting was an accident—to Officers Talley, Zapata, and Clogher immediately after the shooting.

For the aforestated reasons, we find the <u>Doyle</u> violation harmless beyond a reasonable doubt.

### III.   *Brady* Claim

Williams complains that the state suppressed Milton, Jr.'s interview with the police, conducted on the night of the shooting. In it, Milton, Jr. states:

> This as [sic] best as I can remember. I was comin' in to study with my mom. And my dad was comin' in fussin' because he was mad. They was havin' an argument about somethin'. And then he, he had went in the bedroom, in the bedroom, got ready for bed. While he was puttin' away the gun, she was also fussin' back, sayin' that she wasn't doin' what he said. But [<u>pause</u>] he, he had the gun and the gun went off [<u>pause</u>] by mistake and then my mama had fell down on the floor.

Williams avers that he could have used this statement of Milton, Jr.'s to impeach his testimony at trial, where Milton, Jr. testified that, after the shooting, Williams told him the shooting had been an accident. This statement to the police,

10

Williams contends, indicates that Milton, Jr. independently concluded that the shooting was an accident and did not merely rely on Williams's characterization of it as such.

"[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. State of Maryland, 373 U.S. 83, 87 (1963). "To establish a Brady claim, a habeas petitioner must demonstrate that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the petitioner, and (3) the evidence was material." Little v. Johnson, 162 F.3d 855, 861 (5th Cir. 1998). "[F]avorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Kyles v. Whitley, 514 U.S. 419, 433 (1995) (quoting United States v. Bagley, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.)).

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

> Id. at 434 (quoting Bagley, 473 U.S. at 678).

Williams's Brady claim must be rejected because it fails all

11

three requirements of a Brady violation.  First, the prosecution did not suppress Milton, Jr.'s interview.  Williams was aware of both the existence and contents of Milton, Jr.'s statement to the police the night of the shooting because Williams's counsel cross-examined Milton, Jr. regarding it.  Significantly, Williams's counsel chose not to attempt to impeach Milton, Jr. with the above quoted passage.

Williams's counsel's strategic choice in this regard is likely a function of the fact that the statement fails the second prong of the Brady test: Milton, Jr.'s interview is simply not favorable to Williams.  Had Williams sought to impeach Milton, Jr. with the above quoted statement, the prosecutor would have pointed to the following exchange occurring later in the interview:

> Q.    You, you said that your father said it was a mistake that he shot your mother?
> A.    Yes.
> Q.    But you couldn't see if it was a mistake or not?
> A.    No.  I couldn't.

In short, Milton, Jr.'s statement to the police is wholly consistent with his testimony at trial: his father had told him that the shooting was an accident, and he had no independent basis for assessing the veracity of his father's account.

Finally, Milton, Jr.'s statement is not material.  No reasonable probability exists that, had Milton, Jr.'s statement been disclosed to Williams, that a different outcome would have ensued.  Milton, Jr.'s interview with the police in no way

undermines confidence in the verdict against Williams.  Even had Williams not been aware of Milton, Jr.'s statement and its contents, the statement is not favorable to Williams and merely reiterates Milton, Jr.'s testimony at trial.  The jury's decision would have been unchanged had the statement been admitted into evidence.

Therefore, we must reject Williams's <u>Brady</u> claim as meritless.

**IV.      Standing Trial in Shackles and Prison Garb**

Williams alleges that the state tried him in prison garb, with his legs shackled.  He claims this sent a message to the jury that the he was dangerous and an escape risk, and denied him the full benefit of the presumption of innocence.

"[T]he state may not compel an accused to appear before the jury in prison garb."  <u>United States v. Nicholson</u>, 846 F.2d 277, 278 (5th Cir. 1988) (citing <u>Estelle v. Williams</u>, 425 U.S. 501 (1976)).  Similarly, shackling "pose[s] a threat to the fact-finding process and [must] . . . be closely scrutinized."  <u>Id.</u> (citing <u>Holbrook v. Flynn</u>, 475 U.S. 560 (1986)).

Two problems exist with Williams's claim.  First, Milton, Jr. identified Williams at trial as "that man in the white shirt," an identification that is inconsistent with Williams's claim that he stood trial in that mainstay of prison fashion, the orange jumpsuit.  Second, Williams made no objection to his being

13

forced to wear prison garb and leg irons at trial, a fact that led the district court to conclude that Williams was not actually so dressed.  Inasmuch as the trial record is devoid of any indication that Williams was tried in prison garb and reflects the contrary, we conclude that Williams has not carried his burden of showing a violation of his asserted constitutional right.

For the foregoing reasons, the judgment of the district court dismissing the habeas claims is

AFFIRMED.